### In the Interest of L.C., L.C., et al., Children.

### No. 06–04–00020–CV.

Court of Appeals of Texas, Texarkana.

Submitted June 18, 2004.

Decided Sept. 16, 2004.

---

William T. Hughey, Law Office of William T. Hughey, Kevin McCarter, Marshall, for appellant.

Joe Black, Dist. Atty., Jennifer Truelove, Asst. Dist. Atty., Marshall, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Chief Justice MORRISS.

After many complaint investigations by the Texas Department of Family and Protective Services over a number of years, the long nightmare[1] involving Kimberly Choyce James and her children has resulted in the harsh reality of losing, in the trial court, her parental rights to her children. James' parental rights to her five remaining[2] children—B.J. and J.J., children James shared with her husband, Darren James, and a daughter L.C., a son L.C., and S.C., James' children from earlier relationships[3]—were terminated after a jury trial. James now challenges the jury charge and the legal and factual sufficiency of the evidence to support the jury's findings. We affirm, after considering James' five points of error, because we hold the form of jury submission was proper and the evidence was sufficient. Our analysis is structured in this way:

1. The form of jury submission was proper.

2. The evidence was sufficient to show that at least one predicate act had been committed and that termination was in the children's best interest.

 a. The evidence was legally and factually sufficient to show at least one predicate act.

 i. Predicate Act A—Knowingly Putting Children in Endangering Conditions—was supported by legally and factually sufficient evidence.

 ii. Predicate Act B—Knowingly Exposing Children to Endangering Conduct—was supported by legally and factually sufficient evidence.

 iii. Predicate Act C—Child-Endangering Controlled Substance Use—was supported by legally and factually sufficient evidence.

 b. The evidence was legally sufficient to show that termination was in the children's best interest.

### 1. Form of Jury Submission was Proper (addressing James' second point of error)

 The State's petition for termination alleged three statutory grounds or predicate acts as authorized by Section 161.001(1)(D), (E), and (P) of the Texas

---

1. For an extensive factual and procedural background, please see the Appendix at the end of this opinion.

2. James had previously relinquished her parental rights to A.J., a child she shared with her husband, Darren. A.J. had been born with fetal alcohol syndrome and had needs James could not meet.

3. The Court is advised that Darren's parental rights have been terminated by a default judgment taken after service of process, and that one father, Irvy Allen, executed a waiver of interest, after which his parental rights were terminated by a default judgment. The parental rights of the other two fathers, Christopher Rodgers and Walter Davis, are pending with no service known at this time.

Family Code. *See* TEX. FAM.CODE ANN. § 161.001(1)(D), (E), and (P) (Vernon 2002). The jury charge did not require the jury to make a specific finding on each statutory ground, instead charging the jury that termination was authorized if at least one of three predicate acts occurred:

For the parent-child relationship in this case to be terminated, it must be proven by clear and convincing evidence that at least one of the following events has occurred:

"KIMBERLY JAMES has knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; OR

"KIMBERLY JAMES has engaged in conduct or knowingly placed the child with a person who engaged in conduct which endangers the physical or emotional well-being of the child; OR

"KIMBERLY JAMES has used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child, and (1) failed to complete a court-ordered substance abuse treatment program; or (2) after completion of a court-ordered substance abuse treatment program continued to abuse a controlled substance.

. . . .

*QUESTION NO. 1*

Should the parent-child relationship between KIMBERLY JAMES and the children be terminated?

Answer "Yes" or "No" as to each child:

James contends the trial court erred in denying her request that the jury be asked to decide separately which of the three alleged statutory grounds had occurred. She contends this method should have been used instead of the disjunctive charge and broad questions format that was used.

■■■ We review alleged error in submission of a jury question under an abuse of discretion standard. *See Tex. Dep't of Human Servs. v. E.B.,* 802 S.W.2d 647, 649 (Tex.1990). A trial court's discretion in submitting a question to the jury is abused if the submission is arbitrary, unreasonable, and without reference to any guiding rules or principles. *See Goode v. Shoukfeh,* 943 S.W.2d 441, 446 (Tex.1997).

In all jury cases, the court shall, whenever feasible, submit the cause on broad-form questions. TEX.R. CIV. P. 277; *see In re B.L.D.,* 113 S.W.3d 340, 348 (Tex.2003). The Texas Supreme Court has determined that Rule 277 applies in proceedings to terminate parental rights, thus resolving this issue contrary to James' position. *See E.B.,* 802 S.W.2d at 649. In upholding submission of questions to the jury in broad form very similar to those submitted in the instant case, the Texas Supreme Court explained how E.B.'s argument focused on the wrong question:

The controlling question in this case was whether the parent-child relationship between the mother and each of her two children should be terminated, not what specific ground or grounds under § 15.02 [4] the jury relied on to answer affirmatively the questions posed. All ten jurors agree that the mother had endangered the child by doing one or the other of the things listed in § 15.02.

*Id.* The Texas Supreme Court has impliedly affirmed its holding in *E.B. See In re B.L.D.,* 113 S.W.3d at 354–55 (concluding the charge "follows our precedent in *E.B.,* tracks the statutory language of the Family Code, and comports with Texas Rules of Civil Procedure 277 and 292").

4. Section 15.02 of the Texas Family Code is now Section 161.001.

Despite *E.B.*'s holding, several other biological parents have advanced this "ten jurors" argument. The issue has repeatedly been resolved against them. *See In re J.M.M.*, 80 S.W.3d 232, 249 (Tex. App.-Fort Worth 2002, pet. denied) ("We cannot agree ... that broad-form jury charge submissions are per se violative of due process in termination cases."); *In re K.S.*, 76 S.W.3d 36, 49 (Tex.App.-Amarillo 2002, no pet.) ("We are bound to follow *E.B.* unless the Texas Supreme Court overrules or vitiates it."); *In re M.C.M.*, 57 S.W.3d 27, 31 n. 2 (Tex.App.-Houston [1st Dist.] 2001, pet. denied) ("*E.B.* has not been overruled, and this Court must follow it.").

We, too, are bound by *E.B.* It permits submission of a disjunctive question regarding a parent's predicate act or omission under Section 161.001(1). Here, we have such submission and conclude the trial court did not abuse its discretion in overruling James' objection to the jury charge. We overrule James' second point of error, related to the jury charge.

2. *Evidence was Sufficient to Show At Least One Predicate Act and that Termination was in Children's Best Interest*

■ A court may order involuntary termination of parental rights only if the court finds that (1) a parent has committed a predicate act or omission harmful to the child, and (2) termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001 (Vernon 2002). Any complaint that the evidence is legally or factually insufficient to support the findings necessary for termination is analyzed by a heightened standard of appellate review. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

■ In reviewing the legal sufficiency of the evidence, we view all the evidence in a light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. TEX. FAM. CODE ANN. § 101.007 (Vernon 2002); *In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 25. If, in light of the entire record, the disputed evidence that a reasonable trier of fact could not have credited in favor of the finding is so significant that a trier of fact could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *In re J.F.C.*, 96 S.W.3d at 266.

a. *Evidence was Legally and Factually Sufficient to Show at Least One Predicate Act*

After review of the record, we find legally and factually sufficient evidence to support *each* of the three alleged predicate acts, though support for any one of the three would be sufficient to support the necessary finding of a predicate act.

i. *Predicate Act A—Knowingly Putting Children in Endangering Conditions—was Supported by Legally and Factually Sufficient Evidence (addressing James' third point of error)*

■■ James contends the evidence is insufficient to establish by clear and convincing evidence that she "knowingly placed or knowingly allowed children to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM.CODE ANN. § 161.001(1)(D). Under this section, we must examine the time before the children's removal to determine whether the environment itself posed a danger to the child's physical or emotional well-being. *Ybarra v. Tex. Dep't of Human Servs.*, 869 S.W.2d 574, 577 (Tex.App.-Corpus Christi 1993, no writ); *In re S.H.A.*, 728 S.W.2d

73, 84 (Tex.App.-Dallas 1987, writ ref'd n.r.e.). "Endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment; it means to expose to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987); *In re A.B.,* 125 S.W.3d 769, 776–77 (Tex.App.-Texarkana 2003, pet. denied). Thus, surroundings can endanger the well-being of a child without the child suffering actual physical injury. *In re A.B.,* 125 S.W.3d at 777. Subsection (D) of Section 161.001(1) permits termination of parental rights based on a single act or omission by the parent. *Id.* at 775.

■ Without question, sexual abuse is conduct that endangers a child's physical or emotional well-being. *See id.; In re R.G.,* 61 S.W.3d 661, 667 (Tex.App.-Waco 2001, no pet.); *In re King,* 15 S.W.3d 272, 276 (Tex.App.-Texarkana 2000, pet. denied). Parental knowledge that an actual offense has occurred is not necessary; it is sufficient that the parent was aware of the potential for danger and disregarded that risk. *In re A.B.,* 125 S.W.3d at 775; *In re R.G.,* 61 S.W.3d at 667–68; *In re Tidwell,* 35 S.W.3d 115, 118 (Tex.App.-Texarkana 2000, no pet.). The aggravated sexual assault of a child in the home is conduct we may infer will endanger the physical and emotional well-being of other children in the home who may discover the abuse or may be abused themselves. *In re R.W.,* 129 S.W.3d 732, 742 (Tex.App.-Fort Worth 2004, pet. denied); *In re King,* 15 S.W.3d at 276. Thus, Darren's reputed sexual abuse of L.C. created surroundings which not only endangered L.C., but also endangered the other four children in the household.

The record reveals ample evidence that James, at a minimum, knew of the potential for danger of sexual abuse by Darren and failed to adequately protect the children from that risk. One of the children, L.C., testified that from the time she was six years of age Darren sexually abused her by having sexual intercourse with her, and that at some point in time L.C. told James. James explained that in response she started watching Darren around the children and staying up late. She would put all the children in one room and try to stay at home more often. Such measures, while inadequate to sufficiently protect the children, demonstrate that James was aware of a risk of endangerment. James also testified that, during the two weeks since she heard about the sexual abuse, she had made one attempt to report the matter to the police. The police station was closed at the time, however, and no other attempt was made. Such a step, again inadequate to protect the children, does indicate James was aware of a potential for danger and allowed the children to remain in this environment despite the risk. In fact, for some unexplained reason, James rejected her grandmother's offer to let L.C. stay at her house in order to get away from Darren.

The record also reveals endangering conditions other than those relating to sexual abuse. James admits Darren was probably physical with the children when she was not around. Despite the likelihood, she left the children in Darren's care. Further, James admitted she abused alcohol for many years, from approximately 1992 to 2002. She also admitted she had been abusing cocaine for approximately one year before the children's removal. Her long history of drug and alcohol abuse lends itself to an unstable home environment and weighs in favor of termination of her parental rights. *See In re A.B.,* 125 S.W.3d at 777.

Based on the foregoing evidence, we conclude the evidence was sufficiently clear and convincing to support the trial

court's finding on this point. Looking at the evidence in a light most favorable to the finding of the trial court, we conclude a reasonable trier of fact could have formed a firm conviction that James knowingly placed or allowed her children to remain in conditions or surroundings that endangered their physical or emotional well-being. Also, the disputed evidence on the matter is not so significant that the jury could not have formed a firm conviction or belief that its finding was true. We overrule James' third point of error.[5]

*ii. Predicate Act B—Knowingly Exposing Children to Endangering Conduct—was Supported by Legally and Factually Sufficient Evidence (addressing James' fourth point of error)*

■ James' fourth point of error asserts that the evidence is factually and legally insufficient to support a finding she "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *See* Tex. Fam. Code Ann. § 161.001(1)(E). Here, our inquiry, unlike that under Section 161.001(1)(D), focuses on conduct of either the parent or a person with whom the parent has placed the children. *See In re A.B.*, 125 S.W.3d at 777. The evidence must show a "course of conduct," while subsection (D) permits termination based on a single act or omission. *Id.* We use the same definition of "endanger" as we do in our inquiry under subsection (D). That is, we look for more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment; we look for a course of conduct which exposes the children to loss or injury or which jeopardizes the children. *See Boyd*, 727 S.W.2d at 533. Here, we look not only at evidence regarding the parent's active conduct, but also evidence showing the parent's omissions or failures to act. *In re A.B.*, 125 S.W.3d at 777.

Placement with an abusive parent or relative is endangerment under subsection (1)(D) or (1)(E) of Section 161.001. *In re J.M.M.*, 80 S.W.3d at 242 (citing *In re J.M.C.A.*, 31 S.W.3d 692, 698 (Tex.App.-Houston [1st Dist.] 2000, no pet.); *In re W.S.*, 899 S.W.2d 772, 778 (Tex.App.-Fort Worth 1995, no writ)). If the parent whose rights are at issue did not have notice that the other parent was abusive or had violent tendencies, however, placing the child with that parent will not be endangerment. *See In re D.J.*, 100 S.W.3d 658, 669 (Tex.App.-Dallas 2003, pet. denied). Here, the record supports the conclusion that James had notice of Darren's sexual abuse.

James testified she had heard the sexual abuse allegations before authorities learned of L.C.'s allegation and removed the children from the home. The record indicates that all five children were living in the household during the time after James learned of the sexual abuse and before their removal from the home. James' failure to protect the children adequately, even after having been told about the sexual abuse, represents a course of conduct which endangered the well-being of the children. Without the protection of

---

5. We recognize that an affirmative finding by clear and convincing evidence satisfying any one of the subsections of Section 161.001(1) is sufficient to terminate parental rights. *See In re S.F.*, 32 S.W.3d 318, 320 (Tex.App.-San Antonio 2000, no pet.). We could, therefore, affirm the trial court's decision based on our conclusion that James knowingly allowed the children to remain in endangering conditions or surroundings, without addressing any of her other contentions regarding the predicate act or omission under Section 161.001(1). *Id.* We will address these issues for fairness and certainty. *See In re A.B.*, 125 S.W.3d 769, 776 (Tex.App.-Texarkana 2003, pet. denied).

their mother, the children may suffer continued abuse and may feel less inclined to report any abuse.

There is evidence of sexual abuse by Darren. L.C., twelve years old at the time of trial, testified Darren had abused her since she was six years old. Without question, these years of sexual abuse certainly represent a course of conduct that endangered the well-being of the children. *See In re King,* 15 S.W.3d at 276.

James failed to guard the children and left them with a man whom she had been told was sexually abusive. Her action in leaving the children in Darren's care, her failure to take sufficient action to protect them, and Darren's actions provided the jury with legally and factually sufficient proof to support the finding by clear and convincing evidence that James engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical· or emotional well-being of the children. We overrule James' fourth point of error.

*iii. Predicate Act C—Child–Endangering Controlled Substance Use—was Supported by Legally and Factually Sufficient Evidence (addressing James' fifth point of error)*

· [10] James also challenges the sufficiency of the evidence to show she used a controlled substance "in a manner that endangered the well-being of the children." *See* TEX. FAM.CODE ANN. § 161.001(1)(P). She contends that, although she admitted having used marihuana and cocaine, she did not use either substance in a manner that endangered the children.

We believe James' view that her substance abuse did not endanger her children is misplaced. Having to go into drug rehabilitation forced James to leave the children with her cousin, Cassandra Harris. The record shows that the State removed

the children from Harris' care and placed them in temporary placement when S.C., at age two, suffered a broken femur. While we note that James was attempting to go through rehabilitation, we also point out it was her drug use that caused her to have to leave the children in order to attend the program. Because she had to attend the rehabilitation program, she had to leave the children in unsafe surroundings.

As previously discussed, James did make at least two attempts at mandatory rehabilitation. The Department included such services in its family services plan designed for the family. James continued to use drugs even after completion of the rehabilitation program, knowing that doing so could lead to termination of her parental rights. In fact, she admits having used cocaine for at least a year before the removal of the children. The children, especially the younger two, J.J. and B.J., experienced a great deal of trauma when the children were removed from their home and their mother. This disruption and trauma in the children's lives is directly caused, at least in part, by James' drug use.

■ The jury is free to use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence. *United States v. Heath,* 970 F.2d 1397, 1402 (5th Cir. 1992). It was authorized, then, to determine that a mother with a long history of drug and alcohol abuse, who therefore had several encounters with the Department and who admitted abusing cocaine for at least one year, used a controlled substance in a manner that endangered the well-being of her children. Viewing the evidence in a light most favorable to the

jury's finding, we conclude a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. Additionally, the disputed evidence that a reasonable jury could not have credited in favor of the finding is not so significant to prevent it from forming a firm belief or conviction, making the evidence factually sufficient.

*b. Evidence was Legally Sufficient to Show that Termination was in Children's Best Interest (addressing James' first point of error)*

 Under Section 161.001, in addition to finding at least one predicate act, the trier of fact must find that termination is in the best interest of the child. See Tex. Fam.Code. Ann. § 161.001(2). There is a strong presumption that the best interest of the child is served by keeping custody in the natural parent. *See In re D.M.*, 58 S.W.3d 801, 814 (Tex.App.-Fort Worth 2001, no pet.).

██ When determining the best interest of the child, a court should consider the following factors: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the parental ability of the individuals seeking custody; (4) the programs available to assist these individuals to promote the best interest of the child; (5) the plans for the child by these individuals or by the agency seeking custody; (6) the stability of the home or proposed placement; (7) the acts or omissions of the parents which may indicate that the existing parent-child relationship is not a proper one; and (8) any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.1976). However, best interest does not require proof of any unique set of factors, nor does it limit proof to any specific factor. *In re H.R.*, 87 S.W.3d 691, 700 (Tex.App.-San Antonio 2002, no pet.).

Evidence of the children's desires is extremely limited. L.C. testified she and her siblings wanted to go home with their mother. She described a loving, happy relationship between the children and James. There is no other evidence of the desires of the children.

The emotional and physical needs of the children suggest that termination is in their best interest. James learned of L.C.'s claims of sexual abuse before L.C.'s report to the abuse hotline. In response to L.C.'s claims, James testified she stayed awake more when L.C. was in the home. James failed to meet the emotional and physical needs of L.C. who, having experienced years of sexual abuse by her stepfather, would naturally need her mother's comfort and support. L.C. stated she did not know whether her mother believed her. She testified that, when she first told her mother about the abuse, her mother would "give her a whooping." Later, James' actions and statements when the children were removed indicate James still may not have believed L.C. James testified that, at the time, she did not know what to believe. Based on her previous reactions to L.C.'s outcry, it would appear James is ill-equipped to respond to any future emotional needs resulting from the sexual abuse.

Further, there is evidence in the record of medical neglect of the children when James failed to take S.C. to the doctor when he had been running a fever for weeks. There is also evidence of James failing to provide the children with adequate clothing to protect them from the cold weather.

Evidence concerning James' parenting ability and her failure to use available programs suggests that termination is in the children's best interest. The record reveals at least eleven incidents or investigations involving the Department between

December 1996 until the removal of all the children in September 2003. Admittedly, a mere complaint or investigation, alone, proves nothing. By James' own admission, however, she abused alcohol regularly from 1992 to 2002. She also admitted using marihuana and cocaine at least throughout the year before the removal of the children. James tested positive for cocaine in November 2003, shortly after removal of the children. James also admits she relinquished her parental rights to A.J., a son born in 1996, who suffered from fetal alcohol syndrome. From the record, it does not appear James has developed any long-term parenting skills or has benefited from the many services and programs the Department has provided her over the years.

Further, James offered the jury many excuses for her acts and omissions. She blames the Department and claims that most of her involvement with the Department was instigated by telephone calls from someone who was "out to get her." The blame-shifting and conspiracy theories illustrate James' failure to take responsibility for her actions and inactions. Ultimately, this attitude would likely inhibit any improvements or growth within the family.

James is correct in stating there is no evidence of the children's foster home environment. However, this factor is not dispositive. Thus, an absence of evidence supporting this particular factor will not be fatal to the jury's finding that termination is in the children's best interest. *See In re H.R.*, 87 S.W.3d at 700.

Based on James' actions, her inactions, her history of drug abuse, and her failure to take responsibility for and remedy past problems, we conclude the evidence was legally sufficient to support the jury's determination that termination was in the best interest of the children. Even though James testified she completed certain services under the Department's plans and participated in positive activities with the children, we conclude the evidence was factually sufficient to support the trial court's finding that termination was in the best interest of the children. We overrule her contention to the contrary.

*Conclusion*

Having found no error in the jury charge and having found legally and factually sufficient evidence in the record to support the jury's findings as to termination, we overrule all James' points of error and affirm the trial court's termination of her parental rights.

## APPENDIX

### Factual and Procedural Background

Kimberly Choyce James and Darren James had been married three years and had previously lived together since 1995 in Waskom, Texas. James and Darren had three children together: A.J., B.J., and J.J. James has three other children from earlier relationships: a daughter L.C., a son L.C., and S.C. In 1997, James relinquished her parental rights in A.J. who was born sixteen weeks prematurely with fetal alcohol syndrome and, as a result, had special needs James could not meet. At the time of the hearing on the State's petition for termination, the children whose interests were at stake were as follows: daughter L.C., age 12; son L.C., age 10; son S.C., age 9; son J.J., age 5; and daughter B.J., age 4.

James' involvement with the Department began December 24, 1996, when hospital staff reported physical and medical neglect of A.J., who was still hospitalized since his birth in May 1996. The hospital reported that James had very little contact with A.J. and that she was reluctant to participate in the training offered to help

her meet A.J.'s special needs. The Department worked with James, getting her the proper assistance so A.J. could be released to her.

On March 4, 1997, the Department again received allegations of physical and medical neglect of A.J. He had lost one pound and had failed to thrive while in James' care. A.J. was hospitalized again, and the Department reopened the case and provided family preservation services for the family, including weekly services in order to help James meet the needs of her family.

On July 28, 1997, only ten days after A.J. had been released to James a second time, the Department received another call concerning his health. A.J.'s condition had deteriorated, and he was again hospitalized. A.J. was removed from James' care. She would later voluntarily relinquish her parental rights to A.J. James was admitted into a drug and alcohol abuse treatment program. During this time, the five other children were placed in the care of James' cousin, Cassandra Harris, at James' request.

On September 2, 1997, while James was still in rehabilitation and while the children were in the care of Harris, the Department received a report of neglectful supervision in connection with two-year-old S.C.'s broken leg. The Department removed the children from Harris' care and temporarily placed them outside the home. The Department offered James psychological and counseling services. She participated in a post-treatment drug program and parenting classes. Her five remaining children were returned to her care March 5, 1998.

Approximately three months later, in June 1998, the Department received a report alleging physical abuse of S.C. by James. The report alleged that a drunken James lifted S.C. by his arm and shook him vigorously. The Department could not gather enough information to confirm the allegations of abuse. Thus, the case was "ruled out with factors controlled." [6]

On April 13, 2000, a report of neglectful supervision of the four younger children came into the Department. Allegations were made concerning James' drug use in the home. James' drug screen tested negative, and the case was closed.

On May 23, 2001, the Department received a report alleging James had hit S.C. in the mouth, causing a swollen lip. S.C. later recanted the story that his mother hit him and told varying stories concerning the injury. He finally stated he could not remember how he received the injury. During the investigation, the Department discovered S.C. had been ill with a fever for over a month. The Department put in place a safety plan in which James was required to obtain medical attention for S.C. and report to the Department. The case was then closed.

On December 31, 2001, the Department received another report of physical abuse of S.C. by James. S.C. had another lip injury, this time a split lip, reportedly a result of James' discipline. The report also alleged S.C. had mimicked preparation for intravenous drug use. During the investigation, Department staff became concerned that S.C. was not properly dressed for the winter weather. S.C. denied all the allegations. The Department implemented a safety plan regarding proper cold weather clothing and appropriate

---

**6.** Department staff member Deidra Phillips explained that a notation "ruled out with factors controlled" means "there were some significant things ... that needed to be changed ... in order to provide safety or reduced risk and keep the family intact."

discipline. James explained that the injury was due to chapped lips.

The Department received another report February 19, 2002, regarding James' drug use. The Department investigated a case of neglectful supervision of J.J. and B.J. Allegations made accused James of smoking marihuana in front of her two youngest children. James' drug screen came back negative for marihuana use, and the Department closed the case.

On March 25, 2002, the Department received more allegations of physical abuse of one of her children. The caller reported that James was heard yelling for someone to bring her a belt. Shortly thereafter, a child was heard screaming for about fifteen minutes. There were also more allegations that James used drugs in front of her children. The children denied the allegations that they were physically abused. The Department requested another drug test. Since the February 19, 2002, case was still pending at this time, the Department closed this case by combining it with the February case.

Finally, on September 16, 2003, the most recent involvement with the Department began when a family friend called daughter L.C.'s school and informed school officials of the allegations of sexual abuse by Darren. School officials called the police, who then called the Department. L.C. gave a written statement to police describing years of sexual abuse by her stepfather. Mandy Bryan, an investigator with the Department, went to the junior high school, where she spoke with the chief of police and obtained additional information from L.C. L.C. stated she did not feel safe returning to her house. Based on L.C.'s statement, Bryan went to the house to conduct an interview of the parents and determine whether the children should be removed during the investigation.

After Bryan arrived and explained her purpose for being there, Darren just smiled and shook his head. James became very upset and claimed she did not know about the allegations. Bryan asked James to suggest a safe place for the children during the investigation of the abuse allegations, and James responded she knew of no one whom she trusted. James then stated that the Department should just take the children, that they would just take them anyway. She stated she just did not care anymore.

According to Bryan, while the children were packing some of their things, James stated "[L.C.] started all of this mess and she would get hers." James denied ever having made such a statement. Since James could not provide the Department with a suitable home in which the children could be placed temporarily, the Department began a full removal of the children, including a petition for termination of the parent-child relationship. The children were placed in foster care.

The day after L.C.'s outcry and the removal of the five children from the home, the Department filed its Petition for Protection of a Child, for Conservatorship, and for Termination in a Suit Affecting the Parent–Child Relationship. On January 14, 2004, the trial court heard the Department's petition. The Department presented evidence supporting L.C.'s allegation of sexual abuse, evidence of the prior cases concerning James, evidence of James' drug and alcohol abuse, and evidence that L.C. had told her mother of the sexual abuse before her outcry. James presented evidence of her attempts to protect the children, evidence of the pleasant things the family does together, evidence of her recovery from drug and alcohol abuse, and evidence that Darren will have no more contact with the children. The jury found that James had committed an act neces-

sary for termination and that termination of the parent-child relationship was in the best interest of the children.