NO. 07-08-0410-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

JULY 8, 2009

_____

IN THE INTEREST OF D.R.J., A CHILD

_____

FROM THE COUNTY COURT AT LAW NO. 1 OF RANDALL COUNTY;

NO. 5475-L1; HONORABLE JAMES W. ANDERSON, JUDGE

_____

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

**MEMORANDUM OPINION**

Appellant, T.W.,[1] appeals the trial court's order terminating her parental rights to her son, D.R.J.[2] Presenting two issues, she maintains (1) the evidence is legally and factually insufficient to support the grounds for termination and (2) the best interests of D.R.J. are not served by terminating her relationship with him. We affirm.

---

[1] To protect the parents' and child's privacy, we refer to the parents and the child by their initials. *See* Tex. Fam. Code Ann. § 109.002(d) (Vernon 2002). *See also* Tex. R. App. P. 9.8(b).

[2] D.R.J.'s biological father, D.J., voluntarily relinquished his parental rights and is not a party to this appeal.

## Background

In 2004, when T.W. was eighteen years old, she and her paramour, D.J., began a romantic relationship. Shortly thereafter, T.W. became pregnant with D.R.J. and D.J. left her to live with another woman and her child. T.W. and D.J. later reconciled and had an on-again off-again relationship for approximately three years. During the relationship, T.W. was employed; D.J. did not work nor provide for his family, abused and sold drugs, and associated with drug dealers. T.W. claimed that D.J. hit and pushed her on several occasions, and she once observed a handprint on D.R.J.'s face while he was under D.J.'s sole care.

In 2006, T.W. gave birth to a daughter, Q.M.J. T.W. testified that around Christmas of that year, D.J. was physically abusive to her and she left him. She later reconciled with him believing, naively, he had changed. She had a desire to keep her family together because her own father had not been a part of her life.

On April 10, 2007, when Q.M.J. was less than six months old, T.W. was at work and D.J. was the sole caregiver for the children. D.J. took Q.M.J. to the emergency room in respiratory arrest claiming she had choked while drinking from her bottle. Q.M.J. was examined by an emergency room doctor who diagnosed her with traumatic brain injury and vaginal trauma. Q.M.J. was resuscitated and referred to Dr. Eric Levy, a pediatric intensive care doctor. She was also examined by a sexual assault nurse because her injuries were

2

not consistent with the history given by D.J. As a result of the injuries, Q.M.J. died the following day.[3] Dr. Levy described her death as violent, horrific, painful, and traumatic.

After Q.M.J. was admitted to the hospital, T.W. gave law enforcement a statement. According to Officer Eric Smith, on April 10, 2007, T.W. acknowledged that D.J. was the sole caregiver of the children while she worked. She denied that D.J. was abusive or used drugs. The next day, T.W. gave another statement to the police adding that D.J. sold cocaine, but did not use it. She continued to deny any abuse towards herself or her children. She also stated that D.J. did not have any sexual perversions. Prior to giving her third statement on April 16, 2007, Officer Smith spoke with T.W. and she admitted that domestic violence had occurred and she had seen a handprint on D.R.J.'s face while he was in D.J.'s sole care. She claimed that D.J. would get upset when D.R.J. cried.

As a result of Q.M.J.'s death, the Texas Department of Family and Protective Services removed D.R.J. from his home and filed its petition seeking to be named temporary sole managing conservator of D.R.J. and ultimately, termination of T.W. and D.J.'s parental rights. Initially, the Department's goal was family reunification; however, the goal later changed to alternative family placement, i.e., adoption. D.J. signed an affidavit of voluntary relinquishment of his parental rights and the termination suit proceeded against T.W. The Department sought termination against T.W. for one or more of the following acts or omissions:

---

[3]At the time of the final hearing, D.J. was awaiting trial on capital murder charges for Q.M.J.'s death.

3

(1) knowingly placing or knowingly allowing the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child;

(2) engaging in conduct or knowingly placing the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child.

*See* Tex. Fam. Code Ann. § 161.001(1)(D) and (E) (Vernon 2008).[4]

At the final hearing, the Department presented testimony from thirteen witnesses, including T.W. The trial court then ordered termination of T.W.'s parental rights. The trial court further ordered that T.W. have limited access to and possession of D.R.J. in the form of supervised visitation. After numerous home studies, D.R.J. was eventually placed with his maternal great uncle who wishes to adopt him. The uncle is not opposed to T.W. having contact with D.R.J.

**Termination of Parental Rights**

The natural right existing between parents and their children is of constitutional dimension. *See Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). *See also Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Consequently, termination proceedings must be strictly scrutinized. *In the Interest of G.M.*, 596 S.W.2d 846, 846 (Tex. 1980). Parental rights, however, are not absolute, and it is essential that

_____

[4]All references herein are to the Texas Family Code unless otherwise designated.

the emotional and physical interests of the child not be sacrificed merely to preserve those rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

A termination decree is complete, final, irrevocable, and divests for all time that natural right as well as all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit. *Holick*, 685 S.W.2d at 20. Thus, due process requires application of the clear and convincing standard of proof in cases involving involuntary termination of parental rights. *In the Interest of J.F.C.*, *A.B.C.*, *and M.B.C.*, 96 S.W.3d 256, 263 (Tex. 2002). Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *See* § 101.007. *See also In the Interest of G.M.*, 596 S.W.2d at 847; *In the Interest of Z.J.*, 153 S.W.3d 535, 539 (Tex.App.–Amarillo 2004, no pet.).

The Family Code permits a court to order termination of parental rights if the petitioner establishes one or more acts or omissions enumerated under subsection (1) of the statute and also proves that termination of the parent-child relationship is in the best interest of the child. *See* § 161.001; *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976). Though the same evidence may be probative of both issues, both elements must be established and proof of one element does not relieve the petitioner of the burden of proving the other. *See Holley*, 544 S.W.2d at 370; *In re C.H.*, 89 S.W.3d at 28.

5

## Termination of Parental Rights Under § 161.001(1)(D) & (E)

Under section 161.001(1)(D), parental rights may be terminated when clear and convincing evidence shows that a parent knowingly placed or knowingly allowed her child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Although the focus of subsection (D) is on the child's living environment and not on the parent's conduct, parental conduct may produce an endangering "environment." *See In re D.T.*, 34 S.W.3d 625, 633 (Tex.App.–Fort Worth 2000, pet. denied). *See also Matter of B.R.*, 822 S.W.2d 103, 105-06 (Tex.App.–Tyler 1991, writ denied)[5] (citing *In the Interest of L.S., P.P., G.S., and M.S.*, 748 S.W.2d 571 (Tex.App.–Amarillo 1988, no writ). Additionally, subsection (D) permits termination based on a single act or omission by the parent. *In re L.C.*, 145 S.W.3d 790, 796 (Tex.App.–Texarkana 2004, no pet.).

Under section 161.001(1)(E), parental rights may be terminated if clear and convincing evidence shows that a parent engaged in conduct or knowingly placed her child with persons who engaged in conduct that endangered the child's physical or emotional well-being. This inquiry focuses on conduct of the parent or a person with whom the parent has placed the children. *In re L.C.*, 145 S.W.3d at 797. Additionally, the evidence under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious "course of conduct" by the parent is required. *Id.* Under

---

[5]The court held that "[i]t is illogical to reason that inappropriate, debauching, unlawful, or unnatural conduct of persons who live in the home of a child, or with whom a child is compelled to associate on a regular basis in his home, are not inherently a part of the 'conditions and surroundings' of that place or home under [former] section 15.02(1)(D)." *In the Matter of B.R.*, 822 S.W.2d at 106.

6

subsection (E) we look not only at evidence regarding the parent's active conduct, but also evidence showing the parent's omissions or failures to act. *Id.*

"Endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996), (citing *Tex. Dep't of Human Services v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). *See also In re T.N.*, 180 S.W.3d 376, 383 (Tex.App.–Amarillo 2003, no pet.). To "endanger" includes exposure to loss or injury; thus, surroundings can endanger the well-being of a child without the child suffering actual physical injury. *In re L.C.,* 145 S.W.3d at 796.

## Best Interest of the Child Under § 161.001(2)

To determine the best interest of the child, we apply a non-exhaustive list of considerations. *See Holley*, 544 S.W.2d at 371-72. They include the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals involved, the programs available to those individuals to promote the best interest of the child, the plans for the child by these individuals, the stability of the home, the acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper, and any excuse for the acts or omissions of the parent. *Id.*

7

## Standard of Review–Sufficiency of the Evidence

In reviewing the legal sufficiency of the evidence to support an order terminating parental rights, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *In re J.F.C.*, 96 S.W.3d at 266. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* This does not mean that a court must disregard *all* evidence that does not support the finding. *Id*. (Emphasis in original). Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* Thus, in conducting a legal sufficiency review in a parental termination case, we must consider *all* the evidence, not just that evidence which favors the verdict. *See City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005) (Emphasis in original).

The standard for reviewing the factual sufficiency of termination findings is whether the evidence is such that a factfinder could reasonably form a firm belief or conviction

8

about the truth of the Department's allegations. *In re C.H.*, 89 S.W.3d at 25. Under that standard, we consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id*.

Only one statutory ground is required to terminate parental rights under section 161.001(1). *See In re S.F.*, 32 S.W.3d 318, 320 (Tex.App.–San Antonio 2000, no pet.). Therefore, we will affirm the termination order if the evidence is sufficient on any statutory ground upon which the trial court relied in terminating the parent-child relationship. *See id*.

### Sufficiency of the Evidence for Termination Under § 161.001(1)(D) & (E)

In support of her sufficiency of the evidence argument, Appellant maintains that her knowledge of undesirable facts about D.J. did not rise to the level necessary to establish that she "endangered" D.R.J. Appellant cites, among other cases, *In re C.J.F.*, 134 S.W.3d 343 (Tex.App.–Amarillo 2003, pet. denied), in support of her argument. In *In re C.J.F.*, this Court affirmed termination of parental rights of the child's biological parents finding they had endangered the child's physical or emotional well-being. *Id*. at 351. As in the underlying case, the father had been accused of injuring and killing a young sibling. Expert

9

testimony indicated that the deceased child had suffered multiple injuries to his body, especially his head. *Id.* at 349. The evidence established a pattern of physical abuse by the father against the mother and also against the deceased child. Both parents were also drug abusers. In affirming the termination of the mother's parental rights, we concluded that "the singular fact that [the mother] allowed [the deceased child] to remain unattended in the company of one she knew had abused him in the past provide[d] a basis for termination under subsection (E)." *Id.* at 353.

In distinguishing *C.J.F.*, T.W. argues there was no sign of an ongoing pattern of abuse of her children by D.J. She asserts that her knowledge of (1) D.J. pushing and slapping her on two occasions in 2006, (2) a handprint on D.R.J.'s face on one occasion while in D.J.'s sole care, and (3) D.J.'s use of marihuana and cocaine dealing outside the children's presence is not legally nor factually sufficient conduct establishing endangerment of her children. With this, we disagree.

T.W. had fifteen sessions with therapist Darren Snyder from May 29, 2007, to November 26, 2007, to explore a history of violent relationships, unresolved grief, unresolved anger, lack of insight, and lack of job skills. Although Snyder did not testify, his reports were introduced into evidence through therapist Leta Acker, custodian of the records. Snyder's notes reflected that T.W. would need more therapy to make "positive lasting changes for herself and her young son."

10

T.W. was referred by Child Protective Services to Dr. Priscilla Kleinpeter, a family therapist, for a psychological evaluation on June 6, 2007, approximately two months after Q.M.J.'s death. Dr. Kleinpeter testified that the evaluation consisted of a clinical interview, mental status exam, assessment of academic achievement, and personality evaluation. According to Dr. Kleinpeter's testimony, T.W. indicated that D.J. had physically abused her on several occasions, associated with drug dealers, and she was aware that D.J. was using drugs, particularly cocaine. T.W. and D.J. separated several times due to D.J.'s drug use, abuse, irritability, anger, and failure to hold a job. T.W. explained that, to her disapproval, D.J. disciplined D.R.J. by thumping him on the head; however, she believed D.J. to be a good and patient father.

Dr. Kleinpeter described T.W. as guided by "fear of criticism, rejection, and disapproval," which she avoids by "appearing weak, accommodating, overly respectful, and solicitous." Her submissiveness causes her to be "easily dominated, influenced, and abused." She is "overhopeful of change" and believes in "magical solutions to problems." Dr. Kleinpeter diagnosed her with an anxiety disorder and a personality disorder with dependent and paranoid features.

Dr. Kleinpeter testified that notwithstanding T.W.'s therapy from June 2007 through September 2008, she had not changed and still posed a risk to D.R.J. According to Dr. Kleinpeter, T.W. did not make good decisions as a parent by leaving her children with their father as the sole caregiver knowing his tendencies to be abusive and use and sell drugs.

T.W.'s personality characteristics placed her at risk of allowing abuse of her child. Her personality characteristics were part of a long standing pattern that would require long term treatment and be slow to change.

Dr. Edward Basham, a psychologist who evaluated T.W. after a year and a half of sessions with several therapists, testified that T.W. is an insecure individual with an I.Q. of 75 and borderline intellectual functioning. He added that all her therapy had not made the slightest impact on her ability to independently care for D.R.J. Services would not change her personality nor raise her I.Q. According to Dr. Basham, T.W. has weak parenting skills and a personality that draws her to persons who are controlling and dominating. She also has weak verbal skills, poor judgment, lack of sensitivity, and lack of concern. In assessing her parenting skills, he provided that T.W. "is at risk to place her children in risky and neglectful circumstances. [T.W.] appears unable to evaluate the risk that other people may present for her children." Although Dr. Basham concluded that parenting classes would be helpful, he recommended regular outside help for T.W. to "function as an effective parent."

Dr. Basham also testified that T.W. denied any domestic violence but admitted D.J. pushed her at times. He described her as defensive in her manner with "blanket denials about [there] being no problems." As an illustration, he testified that T.W. has never had a driver's license and has received numerous tickets which remained unpaid; yet, she continues to drive not realizing the solution is to obtain a driver's license. Dr. Basham gave

12

a guarded prognosis that completion of services would not make a substantial difference in improving T.W.'s parenting skills.

Lynn Jennings, a counselor, treated T.W. from December 2007 through September 2008, for relationship issues, specifically, how to avoid future abusive relationships. During her testimony, she expressed her surprise to learn that T.W. had not been honest during her sessions about D.J.'s prior abuse and drug dealing which came to light during other expert witnesses' testimony. She also learned that T.W. had failed to mention she had seen a handprint on D.R.J.'s face just weeks before Q.M.J.'s death.

Before the revelations at trial and an examination of Dr. Basham's report, Jennings believed that T.W. was benefitting from her therapy sessions. She expressed the undesirability and hopelessness of terminating T.W.'s parental rights. However, after learning new information, she was concerned about T.W.'s lack of honesty during her sessions. She worried about T.W.'s judgment in leaving her children under the supervision of their father.

T.W. offered telling evidence against herself. When questioned, her answers showed that she knew D.J. used marihuana and used and sold cocaine. Although she testified that D.J. did not use or sell drugs around her children, laboratory results introduced into evidence showed that D.R.J. tested positive for cocaine. The laboratory employee who testified explained that the hair test result of 2201 pg/mg for D.R.J. indicated that for a child to have that result "it would take some exposure on a regular to

13

daily basis to reach a point that even exceeds a positive ratio." According to T.W., D.J. was selling cocaine outside the home and she was unaware that D.R.J. had been exposed to cocaine. She conceded that it was not a good parenting skill to leave her children with someone who might put them in danger by selling cocaine.

T.W. also testified that she and D.J. were involved in a "few physical altercations." She testified that she left him several times not because she felt she was in danger, but to avoid arguing and fighting.

During her psychological evaluation with Dr. Basham, T.W. gave him a history of her relationship with D.J. According to Dr. Basham's report, D.J. left T.W. in 2004 after learning she was pregnant. D.J. moved in with another woman and her child. During that time, D.J. was accused of burning the other woman's child with a cigarette. The report provides, "[T.W.] says that these charges were dropped, [D.J.] and the child's mother denied that [D.J.] was responsible, and [T.W.] gave little further thought to the matter."

Evidence was presented that T.W. is not a bad person. Her drug tests were always negative. Her mother testified that she has always maintained employment and kept a clean home. According to the Department's progress reports, T.W. complied with the Department's Family Service Plan and visited with D.R.J. as permitted by the Department. She also completed a sexual abuse education class, parenting classes, and a Family Crisis Resolution Program. The Department was concerned, however, after reviewing T.W.'s

14

sexual abuse education class course work, that she did not acknowledge or understand the severity of the case.

T.W. testified that she is focusing on herself and her son and is more independent. She testified that she can recognize the signs of a bad relationship and avoid one in the future. She is working, has a nice home, and is planning on obtaining a general equivalency diploma. She acknowledged her prior mistakes and claimed to be making better decisions and having better judgment.

When questioned by the Department's counsel, T.W. admitted that around Christmas 2006, D.J. hurt her and she left him. T.W. conceded that D.J. was violent, used drugs, and sold cocaine. However, she was comfortable leaving her children with D.J. as the primary caregiver because he was their father and she did not believe he would hurt them. However, she testified that when she noticed a handprint on D.R.J.'s face, she assumed D.J. had hit D.R.J. T.W. expressed her hope that D.J. would change but acknowledged that was not enough and she did not take any steps to protect her children.

The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *In re M.A.M.M.*, 75 S.W.3d 73, 77 (Tex.App.–San Antonio 2002, no pet.). The expert testimony and evidence showed that T.W. had consulted several therapists and a psychologist for a year and a half. The gist of their testimony is that therapy has had little or no impact on T.W.'s outlook as a mother. Dr. Kleinpeter testified that past behavior is a predictor of future behavior. There was also

15

testimony that T.W. would require long term therapy to cope with her personality characteristics. D.R.J. needs permanence and does not have the luxury of time.

T.W. has already lost one child and failed to protect D.R.J. from exposure to cocaine. T.W.'s knowledge of D.J.'s unlawful and abusive conduct inherently created conditions or surroundings which endangered the physical or emotional well-being of her children to support termination under section 161.001(1)(D). *In re B.R.*, 822 S.W.2d at 106. Additionally, T.W. engaged in a voluntary, deliberate, and conscious "course of conduct" that supports the court's finding under section 161.001(1)(E). Her knowledge of D.J.'s abusive conduct and drug dealing placed her children in the care of someone who engaged in conduct which endangered their physical or emotional well-being. We conclude the evidence is legally and factually sufficient to support termination of T.W.'s parental rights to D.R.J. under section 161.001(1)(D) and (E). Issue one is overruled.

**Sufficiency of the Evidence to Support Best Interest Finding**

We acknowledge there is a strong presumption that a child's best interest is usually served by awarding custody to the natural parents. *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000). However, we find the evidence described above successfully rebuts that presumption and there is little evidence that is so significant that a reasonable trier of fact could not have reconciled that evidence in favor of its finding that termination of T.W.'s parental rights was in D.R.J.'s best interest.

16

In reviewing D.R.J.'s best interests, we are guided by the *Holley* factors. 544 S.W.2d at 371-72. D.R.J.'s desires were not made known during the hearing. However, he is living with his maternal great uncle and his family and according to the evidence, is adapting well. Although T.W.'s mother expressed her desire that D.R.J. be returned to T.W., she testified that D.R.J. is living in a safe, stable, environment. Lynn Jennings testified that although she "hate[s] to see the rights of [T.W.] terminated," it was her understanding from reports that D.R.J. is "secure and happy and is growing and developing well."

T.W. testified that it is in D.R.J.'s best interest to be with her. There was also evidence that T.W. complied with all the Department's requests and services. However, a parent's compliance does not preclude a finding that termination is in a child's best interest. *See In re A.C.B.*, 198 S.W.3d 294, 298 (Tex.App.–Amarillo 2006, no pet.). Erin Moorman, D.R.J.'s caseworker, testified that termination of T.W.'s parental rights is in D.R.J.'s best interest so that he can be adopted by his maternal uncle and have permanency and "added perks." Although T.W. completed the Department's services, she was also required to make adequate progress before D.R.J. could be placed with her. According to Moorman, T.W.'s lack of honesty during her treatment and services hindered her progress and the Department did not believe she could provide a safe placement for D.R.J. If adopted, D.R.J. would be entitled to a subsidy for his care, Medicaid until age eighteen, and college tuition. Moorman added that D.R.J. is bonding with his maternal uncle and his family and they have moved into a larger home. The maternal uncle is also

willing to allow T.W. to have supervised contact with D.R.J.  Applying the *Holley* factors, we conclude the trial court's finding that termination of T.W.'s parental rights to D.R.J is in his best interest.  Issue two is overruled.

Accordingly, the trial court's order is affirmed.


Patrick A. Pirtle
Justice