

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-18-00065-CV

**IN THE INTEREST OF A.G.-V.**, M.G.-V., D.G.-V., and E.G.-V., Children

From the 37th Judicial District Court, Bexar County, Texas
Trial Court No. 2016-PA-02802
Honorable Barbara Hanson Nellermoe, Judge Presiding[1]

Opinion by:    Marialyn Barnard, Justice

Sitting:    Marialyn Barnard, Justice
Patricia O. Alvarez, Justice
Luz Elena D. Chapa, Justice

Delivered and Filed:  August 22, 2018

AFFIRMED

This is a parental termination case in which appellants, mother ("Mother") and father (Father), separately appeal the trial court's order terminating their parental rights to their four children, A.G.-V., M.G.-V., D.G.-V., and E.G.-V.  On appeal, Mother and Father challenge the sufficiency of the evidence, arguing the evidence is legally and factually insufficient to support the jury's finding that termination was in their children's best interests.  Father further challenges the jury charge, arguing the charge did not require the jury to identify the grounds for termination or make a best interest finding.  We affirm the trial court's order.

---

[1] The Honorable Michael E. Mery is the presiding judge of the 37th Judicial District Court, Bexar County, Texas.  The Honorable Barbara Hanson Nellermoe, retired, was sitting by assignment and signed the order of termination that is the subject of this appeal.

**BACKGROUND**

This case involves the following four children, A.G.-V., M.G.-V., D.G.-V., and E.G.-V., each of whom were adopted by Mother and Father. M.G.-V. was privately adopted by Mother and Father after Mother learned her cousin's friend was pregnant and did not want to keep the baby. At the time Mother and Father adopted M.G.-V., Mother had one biological daughter, D., who the couple was raising. Shortly thereafter, A.G.-V., D.G.-V., and E.G.-V. were placed with Mother and Father as foster children by the Texas Department of Family and Protective Services ("the Department"). Mother and Father ultimately adopted them and raised them along with Mother's biological daughter D. and M.G.-V. In 2015, three more children were placed with Mother and Father as foster children. That same year, the Department received a referral alleging Mother was physically abusing the children and Father was sexually abusing the children. The Department opened an investigation, but it was ultimately closed after the allegations were "ruled out."

Approximately a year later, in March 2016, the Department received another referral, alleging A.G.-V. was being physically and sexually abused. At the time the referral was made, A.G.-V. was fifteen-years-old. The referral alleged A.G.-V. made an outcry that Father was sexually touching her and Mother was hitting her and making her do planks[2] as punishment. During the investigation, A.G.-V. provided the Department with an audio recording wherein Father and Mother could be heard yelling and cursing at the adoptive and foster children in the household for over an hour. According to A.G.-V., she was forced to plank for ten-minutes during the audio. A.G.-V. can be heard pleading and crying in the audio recording as the other children play in the background. By May 2016, Mother and Father voluntarily came to an agreement with the Department to place A.G.-V. with Mother's cousin, E.R. The record reflects that by this time,

---

[2] A review of the record reflects Mother believed a "plank" to be an exercise that involves putting your elbows on the floor in a push-up position and maintaining that position for a specific time frame.

D., Mother's biological child, was an adult and no longer living in the home, and the three foster children who were staying with the family had also been removed from the home because one of them — a five-year-old — began to act out sexually. The adopted children — M.G.-V., D.G.-V., and E.G.-V. — remained with Mother and Father.

In August 2016, the Department received another referral regarding concerns about the remaining children in the household. The referral alleged they were being physically abused by Mother and "groomed" for future sexual abuse by Father. The Department investigated the allegations, and on December 14, 2016, it filed a petition to terminate Mother and Father's parental rights to all four children, A.G.-V., M.G.-V., D.G.-V., and E.G.-V. A hearing for temporary orders was set for January 20, 2017. During the interim, Mother was not allowed to physically discipline the children and Father was not allowed in the home. On January 20, 2017, the hearing for temporary orders was held, and the trial court signed an order naming the Department as the children's temporary sole managing conservator, setting a full adversary hearing, and requiring Mother and Father to comply with any service plan prepared by the Department. Thereafter, the remaining children, M.G.-V., D.G.-V., and E.G.-V., were removed from the home and placed with ChildSafe. A.G.-V. remained with Mother's cousin, E.R.

After the removal, the Department created a service plan for Mother and Father. The service plans required Mother and Father to each have a psychological evaluation and complete counseling classes, anger management classes, as well as parenting classes. Each of the service plans also identified the following goals Mother and Father needed to achieve before the children could be returned: (1) demonstrate a willingness and ability to protect the children; (2) demonstrate an ability to express anger that does not hurt the children; (3) take responsibility for past actions; and (4) demonstrate an ability to change a pattern of abusive behavior. Over the next couple of

months, Father and Mother attended their required classes; however, according to the Department, neither attained the required goals.

Thereafter, the Department moved forward on its petition seeking termination. Mother and Father requested a jury trial, which was conducted over a five-day period in January 2018. At trial, the Department sought to terminate Mother and Father's parental rights to all four children based on the ongoing physical and sexual abuse occurring in the household. Based on the abuse, the Department alleged Mother and Father violated numerous provisions of the Texas Family Code ("the Code"). Specifically, the Department alleged Mother and Father: (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being; and (3) failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of their children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O) (West Supp. 2017). The Department also alleged termination would be in the children's best interests. *See id.* § 161.001(b)(2). During the trial, the jury heard testimony from several witnesses, including therapists who provided counseling services for Mother, Father, and the children; the Department investigator and caseworker who were assigned to the case; school officials and teachers who knew the children before they were removed from the home; D., Mother's biological daughter; as well as Mother and Father.

After considering the evidence, the jury found Mother and Father violated the provisions of the Code as alleged by the Department and that termination would be in the best interests of the children. In accordance with the jury's verdict, the trial court rendered an order terminating Mother and Father's parental rights to A.G.-V., M.G.-V., D.G.-V., and E.G-V. Mother and Father separately appealed to this court.

## ANALYSIS

As indicated above, Mother and Father separately appeal the trial court's order terminating their parental rights. Both Mother and Father challenge the sufficiency of the evidence in support of the jury's finding that termination was in the best interests of their children. *See id.* § 161.001(b)(2). Father also raises a complaint with regard to the jury charge, arguing the charge did not require the jury to identify the grounds for termination or make a best interest finding. We first turn to whether the evidence was sufficient to support the jury's finding that termination of Mother's and Father's parental rights was in the children's best interests.

### *Best Interests*

### *Standard of Review*

A trial court may terminate a parent's rights to a child only if it finds by clear and convincing evidence that the parent committed an act prohibited by section 161.001(b)(1) of the Code and termination is in the best interest of the child. *Id.* § 161.001(b). "Clear and convincing evidence" is defined as "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007. Courts require this heightened standard of review because termination of a parent's rights to a child results in permanent and severe changes for both the parent and child, thus, implicating due process concerns. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2015). When reviewing the legal and factual sufficiency of the evidence, we apply the well-established standards of review. *See* TEX. FAM. CODE ANN. §§ 101.007, 161.206(a); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (legal sufficiency); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (factual sufficiency). In sum, an appellate court must determine whether the evidence is such that the trier of fact could reasonably form a firm belief or conviction that termination was in the child's best interest. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).

In conducting a sufficiency review, we may not weigh a witness's credibility because it depends on appearance and demeanor, and these are within the domain of the trier of fact. *In re J.P.B.*, 180 S.W.3d at 573. Even when such issues are found in the appellate record, we must defer to the fact finder's reasonable resolutions. *Id.*

### Applicable Law

In a best interest analysis, we apply the non-exhaustive *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). In analyzing the evidence within the *Holley* framework, we note that evidence of each *Holley* factor is not required before a court may find that termination is in a child's best interest. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2012). In other words, the absence of evidence as to some of the *Holley* factors does not preclude a fact finder from reasonably forming a strong conviction or belief that termination is in a child's best interest. *Id.* Moreover, in conducting our review of a trial court's best interest determination, we focus on whether termination is in the best interest of the child — not the best interest of the parent. *In re D.M.*, 452 S.W.3d 462, 468–69 (Tex. App.—San Antonio 2014, no pet.).

In addition to the *Holley* factors, we recognize there is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, promptly and permanently placing a child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a). Thus, to determine whether a child's parent is willing and able to provide the child with a safe environment, we also consider the factors set forth in section 263.307(b) of the Code. *Id.*

Additionally, evidence that proves one or more statutory grounds for termination may be probative to prove termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 28 (holding same evidence may be probative of both section 161.001(1) grounds and best interest, but such evidence does not relieve State of burden to prove best interest). In conducting a best interest

analysis, a court may consider in addition to direct evidence, circumstantial evidence, subjective factors, and the totality of the evidence. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Finally, a trier of fact may measure a parent's future conduct by her past conduct in determining whether termination of parental rights is in the child's best interest. *Id.*

*The Evidence*

As indicated above, the jury heard testimony from numerous witnesses. Rebecca Aldrich, an investigations supervisor with the Department, testified the Department became involved with the family in March of 2016 based on allegations that Father was sexually abusing A.G.-V. and both Father and Mother were physically abusing all of the children. Aldrich explained that after the Department investigated the abuse allegations, the allegations were ultimately ruled out due to insufficient evidence. Aldrich stated that in May 2016, the Department received another referral, again alleging Father was sexually abusing A.G.-V., who was fifteen-years-old at the time. Aldrich testified the May 2016 referral also alleged both Father and Mother were using excessive physical force to discipline the children. As a result, the Department began another investigation. During this second investigation, the Department received an audio recording from A.G.-V. The audio recording was admitted into evidence and captures Mother and Father yelling at the children for over an hour. Aldrich testified the Department attempted to work with the family by discussing proper punishment techniques, but Mother and Father denied the allegations of physically abusing the children and refused to listen to the audio recording. Aldrich further testified Mother and Father refused to create a safety plan regarding Father's access to the children. According to Aldrich, due to the lack of cooperation the Department received from Mother and Father, the investigation took "longer than normal" despite the fact the Department tried to work with the family to keep them together. As a result, the Department decided to pursue termination proceedings and remove M.G.-V., D.G.-V., and E.G-V. from the home. Aldrich confirmed that

prior to legal intervention, Mother and Father voluntarily agreed to allow A.G.-V. to stay with E.R., Mother's cousin; however, Aldrich added that Mother "reluctantly" signed the agreement.

Department caseworker, Norma Hayes, testified she became involved with the family after the first caseworker stopped working for the Department. Hayes testified she began working on the case after the service plans were created. According to Hayes, Mother and Father attended their required counseling sessions and classes — specifically, anger management and parenting — however, she did not believe they showed any progress toward their goals. She testified that because she believed they were not meeting their goals, she changed their counselor from Jesse Jessup to Victoria Caylor, who also believed the parents had not shown signs of progress. Hayes further testified that although Mother and Father attended all their visitation sessions, she did not believe it was appropriate that Mother and Father would bring the children gifts at every session. According to Hayes, it became unclear whether the children were happy to see Mother and Father or to receive a gift. Throughout Hayes's testimony, Hayes expressed her concern that Mother and Father refused to admit any wrongdoing or demonstrate a willingness to change; but rather, Mother and Father kept "putting the blame on [A.G.-V.] for other people's actions, and that's not right. That is dangerous actually."

With regard to the therapists who worked with the children, the jury heard testimony from Alejandro Lopez, a therapist with ChildSafe who provided services for M.G.-V. According to Lopez, M.G.-V. had anger outbursts, and he is teaching her how to manage and process her anger appropriately. Lopez further testified M.G.-V. expressed concern about returning home, stating she did not want things that happened before to happen again. Lopez testified M.G.-V. explained there was a lot of spanking and yelling at home. The jury also heard testimony from Holly Ulman, a clinical therapist with ChildSafe who was working with D.G.-V. and E.G.-V. According to Ulman, D.G.-V. had not spoken directly about any memories while living with Mother and Father,

but added that her questionnaire showed potential for "under-response," suggesting D.G.-V. may be avoiding or denying any traumatic experience. Ulman further testified that E.G.-V., on the other hand, showed several symptoms of abuse, such as anger, post-traumatic stress arousal, and dissociation, indicating she has been through some sort of trauma. Ulman stated E.G.-V. acknowledged some "scary things" happened at home, but she did not recall memories in detail. With regard to A.G.-V., the jury heard testimony from Carla Cheatman, who treated A.G.-V. for six sessions between July 2017 and October 2017. Cheatman diagnosed A.G.-V. with post-traumatic stress disorder and stated A.G.-V. showed symptoms of anxiety, low self-esteem, and negative thinking patterns. According to Cheatman, A.G.-V.'s symptoms were related to the emotional abuse A.G.-V. endured. Cheatman testified A.G.-V. said her Father would watch her as she showered. Rosemary Coates also treated all the children and met with them during family counseling sessions. Coates testified A.G.-V. suffered from post-traumatic stress disorder. According to Coates, during family counseling sessions, A.G.-V. and E.G.-V. seemed depressed. Specifically, A.G.-V. appeared to be fearful about returning home, while E.G-.V. expressed fear about the Department's involvement with their lives. According to Coates, A.G.-V. did not share many details about the alleged sexual abuse during the family counseling sessions, but when she was alone, she "was very graphic with the descriptions of what she and her dad experienced."

The jury also heard testimony from school officials and staff members who knew the children prior to their removal from the home. Martha Kizer, the principal of the school A.G.-V. attended, made the referral to the Department regarding A.G.-V.'s outcry. According to Kizer, A.G.-V. was sad, withdrawn, and very quiet; she also indicated A.G.-V. fell asleep in class a lot, which affected her grades. Kizer testified that when she asked A.G.-V. about her fatigue and school performance, A.G.-V. explained she had to get up very early to get the other children ready for school and to make meals for everyone before school. There were also times A.G.-V. would

arrive at school crying, revealing Mother had slapped or yelled at her because she failed to get everyone ready for school. Kizer also testified A.G.-V. told her and other staff members that her parents made her plank for extended periods of time as a form of punishment. With regard to the sexual abuse allegation, Kizer testified A.G.-V. arrived at school one morning crying and wearing shorts, which revealed her knees were covered in blood. Kizer testified A.G.-V. was very upset and threatened to run away. Kizer then contacted the San Antonio Police Department. At that time, A.G.-V. spoke with a detective and Kizer and revealed that on different occasions, her Father was inappropriately touching her.

Detective Edward Sandoval was the SAPD detective who met with A.G.-V. According to Detective Sandoval, A.G.-V. said Father touched "her boobs and her butt when he hugged her" that morning. However, A.G.-V. was unable to describe exactly how the events transpired. Detective Sandoval testified that instead of describing the morning incident, A.G.-V. — who was fifteen-years-old at the time — "relayed an incident that happened when she was 11 years old, and he licked her vagina." Detective Sandoval further testified he doubted A.G.-V.'s credibility because when he asked her why she and Father were fighting that morning, A.G.-V. told him it was over a cell phone and that she had the phone hidden in her room. However, Detective Sandoval testified he later learned Kizer was in possession of the cell phone. The record reflects that at some point, Kizer gave A.G.-V. a cell phone and A.G.-V. recorded an incident that occurred in the house. The audio recording ultimately ended up with the Department. According to Kizer, A.G.-V. never gave her back the cell phone, but rather, A.G.-V. took the phone to her counselor, who listened to the audio recording and shared the audio recording with the Department. Kizer further stated it was her understanding that Mother ended up with the cell phone.

In addition to Kizer's testimony, the jury heard testimony from Tiffany Velasquez, a teacher who taught E.G.-V. and knew A.G.-V. Velasquez testified the children had a strong

relationship with her and she had concerns about their home life with Mother and Father. Velasquez testified she was specifically concerned that A.G.-V. was being sexually abused and that the other children, including the three foster children, were being physically abused. On one occasion, E.G.-V. told her "something bad happened that morning to [A.G.-V.]." Velasquez testified that although E.G.-V. never specifically detailed what was happening at home, E.G.-V. acted out during class. Velasquez further stated that when she would ask E.G.-V. what was wrong, E.G.-V. would just tell her she was very sad.

Melissa Sagan was a paraprofessional who worked at the school the children attended and testified about the children's home life. Sagan testified she knew the family for over five years and she did not believe there was anything to be concerned about. She testified she did not believe the children were afraid of Mother and described them as "happy and loving." She testified the children were clean and well-nourished. Overall, she trusted Mother with the children. Sagan also testified A.G.-V would sometimes spend the night at her house because A.G.-V. knew her son, who was the same age. However, she expressed concern that A.G.-V. and her son may have been inappropriate with each other, and after talking to Mother about her concern, A.G.-V. stopped spending the night.

In addition to the foregoing testimony, Father and Mother both testified on their own behalf. During his testimony, Father described how he and Mother adopted each of the children subject of this suit, and that the Department first became concerned about the children's care in April 2015. Father testified that after receiving a referral that sexual and physical abuse was occurring in the home, the Department began an investigation, but ultimately "ruled out" the allegations. According to Father, the Department was unable to confirm the allegations because A.G.-V. recanted her claims. Father further testified the Department was again called in March 2016 for the same issues, but he denied the allegations of sexual and physical abuse. Father

testified the Department did not work with him or provide him with a service plan, but eventually the Department removed all the children from his household. Father denied his home was chaotic, and when asked about the audio recording, Father stated it was not a normal occurrence, but admitted those types of instances happened once or twice a month. Father testified he rarely cursed or yelled at the children and when asked specifically about the instances of requiring A.G.-V. to care for all the children, making the children plank, hitting the children, or sexually abusing A.G.-V., he denied all instances. Father further testified he believed A.G.-V. did not want to return, but he hoped she would be returned to Mother because he and Mother were no longer together. With regard to the other children, Father testified they appeared to be happy each time he visited them, and he further added he was highly involved in many of their extracurricular activities. Father also testified he attended parenting and anger management classes and participated in family counseling. Father testified he believed he was fully cooperating with the Department.

Mother testified she did not physically abuse the children. Specifically, Mother testified she did not hit the children but on occasion would spank them; according to Mother, "there is a distinction [between hitting and spanking]." Mother testified there was only one occasion in which she made A.G.-V. plank, and it was for one-minute as opposed to ten-minutes. When presented with the audio recording, Mother testified it was the only time she and her husband yelled and cussed at the children. When asked about the banging sounds heard on the audio, Mother testified it was from when she would hit the wall to get the lights to come on. Mother further denied ever forcing A.G.-V. to plank during the audio recording. When asked whether she believed Father was sexually abusing A.G.-V., Mother testified she believed something happened to A.G.-V., but stated she did not believe anything happened between A.G.-V. and Father. Mother then testified A.G.-V. told her about an incident when she was two-years-old and not living with Mother and Father. According to Mother, A.G.-V. told her that when she was living with her biological

- 12 -

mother, an intoxicated man touched her bottom and tried to kiss her and she had to push him off forcefully and slap him. Mother described A.G.-V. as a challenging child. According to Mother, A.G.-V. repeatedly lied to school officials and told them she was not being cared for and was being abused. Mother explained that after the Department became involved with her family in 2016, she agreed to let A.G.-V. stay with her cousin; however, Mother added she was never happy with that decision and was sad when A.G.-V. left. According to Mother, she believed the children were very happy in her home; she described them as "very cheery and happy." Mother also described her visits with the children, specifically pointing out D.G.-V. and E.G.-V. would not want the visits to end and wanted to return home. D.G.-V. and E.G.-V.'s behavior was further confirmed by Rita Rangel, a counselor who monitored the family's visits. Rangel testified the three children — M.G.-V., D.G.-V., and E.G.-V. — were cheerful and excited to see both Mother and Father and were always hesitant to leave after visitations.

Family counselors who treated the family also provided testimony about Mother and Father. Jesse Jessup, a licensed counselor, was initially assigned to the case and met with Father and Mother individually as well as with the children. Jessup testified both Mother and Father acknowledged their behavior recorded on the audio recording and took responsibility for it. It was Jessup's opinion that he believed Mother and Father did not regularly hurt the children and the recorded incident was a one-time occurrence. Jessup further explained he believed Kizer provoked A.G.-V. to challenge her parents by giving her a cell phone to record the incident. Like Father and Mother, Jessup testified problems in the family arose from A.G.-V.'s behavior. Victoria Caylor, however, disagreed with Jessup's assessment of the Father and Mother. Caylor testified she began seeing the family midway through the Department's involvement with the family, and it was her opinion the children were not ready to return to the home. Caylor testified it was her opinion that Mother and Father did not accept responsibility for their behavior because they refused to

acknowledge that any physical abuse beyond what can be heard in the audio recording occurred. According to Caylor, Mother was protective of Father and did not believe he sexually abused A.G.-V. Caylor further testified Mother blamed A.G.-V. for the current situation and opined it was very concerning that Mother refused to accept any responsibility.

E.R. was Mother's cousin who took care of A.G.-V. during the course of the Department's investigation. According to E.R., Mother did not want A.G.-V. to be placed outside of the home; however, A.G.-V. was ultimately placed in her home because of the Department's involvement with the family. E.R. described A.G.-V. as "not easy" to have in the home because A.G.-V. behaved inappropriately with boys her own age. It was E.R.'s opinion that A.G.-V. made bad decisions with boys because she was unable to cope with the sexual abuse she endured from Father. E.R. stated that at no point did A.G.-V. recant her story, and she believed A.G.-V.'s outcry.

*Application*

A. Mother's Appeal

After reviewing the evidence in the light most favorable to the jury's finding, we hold the jury could have reasonably formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interests. *See In re J.P.B.*, 180 S.W.3d at 573; *In re H.R.M.*, 209 S.W.3d at 108. The jury heard evidence that Mother was abusing the children by yelling and cursing at them excessively as well as hitting and slapping them. *See* TEX. FAM. CODE ANN. § 263.307(b)(3) (magnitude, frequency, and circumstances of harm to child); *id.* § 263.307(b)(7) (history of abusive or assaultive conduct by child's family or other with access to child's home); *Holley*, 544 S.W.2d at 371–72. The record reflects several witnesses, including counselors who treated the children, school officials, and school staff members, expressed concern regarding the children's treatment at home. *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(7); *Holley*, 544 S.W.2d at 371–72. Some witnesses described the children as fearful of Mother and

Father, and the jury heard evidence of specific incidents of physical abuse A.G.-V. endured — i.e. coming to school with bloody knees and telling school officials she was often hit and yelled at when she did not get everyone ready for school. *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(7); *Holley*, 544 S.W.2d at 371–72. The jury also heard testimony from the children's teachers and therapists in which both D.G.-V. and E.G.-V. showed symptoms of denial and avoidance and described their home as sometimes "scary." Although Mother and Father denied the allegations of physical abuse, the jury further heard an audio recording in which both parents could be heard yelling and cursing at the children, particularly A.G.-V. A.G.-V. can be heard crying on the audio recording, pleading for things to stop. In addition to this evidence, the jury also heard evidence that one of the counselors, Caylor, did not believe Mother met her goals for reunification even though she completed her anger management and parenting classes and was attending counseling. *See* TEX. FAM. CODE ANN. § 263.307(b)(10) (willingness and ability of child's family to seek out, accept, and complete services and cooperate with Department); *Holley*, 544 S.W.2d at 371–72. Caylor testified she believed Mother did not accept responsibility for her actions, but rather blamed A.G.-V. *See* TEX. FAM. CODE ANN. § 263.307(b)(11) (willingness and ability of child's family to effect positive environmental and personal changes within reasonable period of time); *id.* § 263.307(b)(12) (whether child's family demonstrates adequate parenting skills); *Holley*, 544 S.W.2d at 371–72. And, although the jury heard testimony from Mother, Father, Detective Sandoval, and one of Mother's counselors, Jessup, who each questioned A.G.-V.'s credibility, we do not reweigh issues of credibility because it is ultimately for the jury to believe or disbelieve the witnesses. *See J.P.B.*, 180 S.W.3d at 573. In this case, we hold a rational trier of fact could have believed the testimony of Principal Kizer, E.R., and Caylor's testimony regarding A.G.-V.'s credibility. *See id.* Accordingly, deferring to the jury's credibility determinations, we hold a rational jury could have found termination of Mother's parental rights

- 15 -

was in the children's best interests. *See In re J.P.B*., 180 S.W.3d at 573; *In re H.R.M*., 209 S.W.3d at 108.

### B. Father's Appeal

With respect to Father's appeal, we also hold the jury could have reasonably formed a firm belief or conviction that termination of Father's parental rights was in the children's best interests. *See In re J.P.B*., 180 S.W.3d at 573; *In re H.R.M*., 209 S.W.3d at 108. Although Father, like Mother, denied allegations of abuse, the jury heard testimony from different witnesses who believed Father was sexually abusing A.G.-V. *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(7); *Holley*, 544 S.W.2d at 371–72. Specifically, Principal Kizer, E.R., and Caylor testified they believed A.G.-V.'s outcry, and moreover, they believed Father was grooming the younger children, particularly M.G.-V., after A.G.-V. was placed out of the home. *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(7); *Holley*, 544 S.W.2d at 371–72. Although Father testified he did not sexually abuse A.G.-V. and did not physically hurt or yell at her or any of the other children, the jury heard the audio recording during which Father can be heard cursing and yelling at A.G.-V. *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. The jury further heard evidence from several witnesses who testified some of the other children were inappropriately acting out sexually and having behavior problems, which the witnesses believed was a result of Father's actions. And again, although there was evidence Father completed his anger management and parenting classes as well as attended counseling sessions, there was also evidence that Father failed to meet his goals because he did not accept responsibility for his behavior. *See also* TEX. FAM. CODE ANN. § 263.307(b)(10); *id.* § 263.307(b)(11); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. Having reviewed the record and deferring to the jury's credibility determinations, we hold a rational jury could have

- 16 -

found termination of Father's parental rights was in the children's best interests. *See In re J.P.B.*, 180 S.W.3d at 573; *In re H.R.M.*, 209 S.W.3d at 108.

### *Jury Charge*

In addition to challenging the sufficiency of the evidence, Father challenges the jury charge, arguing the jury charge did not require the jury to identify the grounds for termination or make a best interest finding. Here, the jury charge outlined the three statutory grounds — (D), (E), and (O) — alleged by the Department, charging the jury that termination was authorized if they believed by clear and convincing evidence that at least one of the three predicate acts occurred. In the next paragraph, the charge further instructed the jury that termination was authorized if they also believed by clear and convincing evidence that termination was in the children's best interests. The instructions were then followed by broad form questions, asking the jury to answer "yes" or "no" as to whether Mother's parental rights should be terminated as to each child and whether Father's parental rights should be terminated as to each child. According to Father, the charge should have included the word "and" between predicate grounds and the best interest instruction, and by failing to include the word "and," it was unclear to the jury whether it had to find both prongs before concluding termination was authorized.

We review a trial court's decision to submit or refuse a particular jury instruction under an abuse of discretion standard. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006); *J.A.B. v. Tex. Dep't of Family and Protective Servs.*, No. 03-13-00273-CV, 2013 WL 4487513, at *1 (Tex. App.—Austin Aug. 14, 2013, pet. denied) (mem. op.). "A trial court abuses its discretion when it acts unreasonably or 'without reference to any guiding rules and principles.'" *J.A.B.*, 2013 WL 4487513, at *1 (quoting *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)). When submitting a jury charge, the trial court is afforded more discretion when submitting instructions than when submitting questions. *In re A.R.*, 236 S.W.3d 460, 478 (Tex. App.—Dallas

2007, no pet.). To be proper, an instruction must (1) assist the jury, (2) accurately state the law, and (3) find support in the pleadings and the evidence. *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex. 2000). The omission of an instruction is reversible error only if the omission probably caused the rendition of an improper judgment. *Shupe*, 192 S.W.3d at 579.

Texas Rule of Civil Procedure 277 provides that "[i]n all jury cases, the trial court shall, whenever feasible, submit the cause on broad form questions." TEX. R. CIV. P. 277. "The Texas Supreme Court has determined that Rule 277 applies in proceedings to terminate parental rights." *In re L.C.*, 145 S.W.3d 790, 794 (Tex. App.—Texarkana 2004, no pet.).

Here, the jury charge instructed the jury that termination of Mother and Father's parental rights may be authorized if one of the three alleged statutory grounds were established by clear and convincing evidence. It further stated that for termination to be authorized, "it must *also* be proven by clear and convincing evidence that termination of the parent-child relationship is in the best interest of the children." Accordingly, we disagree with Father's contention that the jury charge was unclear. In this case, the jury charge used the word "also" and specifically instructed the jury that for termination to be authorized, both a predicate ground as well as a best interest finding must be proven by clear and convincing evidence. Thereafter, the instruction was followed by a proper controlling question. *See* TEX. R. CIV. P. 277; *In re L.C.*, 145 S.W.3d at 794. Accordingly, we overrule Father's final issue.

### CONCLUSION

Based on the foregoing, we affirm the trial court's order terminating Mother and Father's parental rights.

Marialyn Barnard, Justice