In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-23-00068-CV
_____

IN THE INTEREST OF A.F., D.F., D.F., A.O., AND D.O.

On Appeal from the 279th District Court
Jefferson County, Texas
Trial Cause No. C-240,719

## MEMORANDUM OPINION

Mother, N.F., appeals from an order terminating her parental rights to her five children, *Amy* (11 years old at removal), *Dennis* (seven years old at removal), *Damien* (six years old at removal), *Anna* (two years old at removal), and *Drew* (one year old at removal).[1] On appeal, Mother argues that the Department of Family and Protective Services ("the

---

[1] We use pseudonyms for the names of the minors and those of their family to protect the minors' identities. Tex. R. App. P. 9.8(b)(2) (Protection of Minor's Identity in Parental-Rights Termination Cases). The Father, D.O., whose rights were also terminated, did not appeal and will only be discussed as necessary.

1

Department") failed to introduce legally and factually sufficient evidence to prove her rights to Amy, Dennis, Damien, Anna, and Drew should be terminated or to prove that terminating them is in the children's best interest.[2] Because Mother's issues lack merit, we affirm.

Background

In January 2022, the Department filed a Petition to terminate Mother's rights on seven grounds, including (D) and (E) allegations that Mother had endangered her children.[3] The Department's petition was supported by an affidavit signed by an investigator for the Department. The supporting affidavit, which was admitted into evidence at trial, contained information about Mother's history with the Department.

Supporting Affidavit:

According to the affidavit, in June 2009, Mother was investigated after testing positive for PCP and benzodiazepine after the birth of her oldest daughter, *Callie*.[4] The Department concluded there was supporting evidence and the allegations were ruled "Reason to Believe."

---

[2] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (b)(2).
[3] *See id.* § 161.001(b)(1)(D), (E), (K), (N), (O), (P), (R).
[4] *Callie* is not one of the children in this suit. The record is unclear as to whether Father is the biological father of Callie.

The Department investigated its second case against Mother from August 2009 to February 2011. At that time, Mother was incarcerated for criminal charges involving drugs and her oldest child was in the care of the child's maternal grandmother.

In April 2015, the Department investigated Mother for her ability to adequately supervise, protect, and care for her children after Mother admitted she was taking Xanax while caring for her children when Mother did not have a prescription for the medication, but she stated she believed there was nothing wrong with taking medications not prescribed to her. The Department concluded there was supporting evidence and the allegations were ruled "Reason to Believe."

In December 2021, an intake was received alleging sexual abuse of Callie by Father. Callie made consistent outcries of sexual abuse and neglect by Father. At the time, law enforcement was actively pursuing charges against Father. The allegations of the sexual abuse of Callie by Father were ruled "Reason to Believe" by the Department.

On January 13, 2022, the Department received a report of concerns of sexual abuse of *Amy* by Father. The report alleged concerns that Mother had refused medical treatment for Amy, even though the forensic

exam reported an extensive sexual abuse history which included genital and anal penetration of Amy by Father. Amy stated that the abuse had been occurring since August 2021 and in a forensic interview at the Garth House, Amy made an outcry of sexual abuse against Father and provided details of the abuse. Amy also described incidents where Father made sexual advances towards her siblings. Amy stated she was told by Mother to lie about what Father had done. Because of the sexual abuse of Amy by Father, the Department removed all the children.

Witnesses and Evidence Presented at Trial:

In February 2023, the Department's suit against Mother and Father was called to trial. Mother appeared and testified in the trial. The trial court heard from three other witnesses: (1) S. Living, the conservatorship caseworker, (2) the Court Appointed Special Advocate (CASA) Volunteer Coordinator, and (3) the CASA assigned to the case.

Living testified that Mother was allegedly present in the next bedroom when the sexual abuse took place. Living said that Mother knew what was going on, Mother did not believe her children, and told her children to lie so Father could stay in the home. Living testified that once Callie made an outcry of sexual abuse, Mother should have been

4

protective of the children. Living stated that it appeared to her that Mother chose Father over the children. According to Living, Mother never admitted to any wrongdoing, and she did not protect her children. Living testified that Mother took no steps to remove Father from the home.

Mother testified at trial that she did not tell Amy to lie about what Father had done, but Mother conceded that she told Amy not to tell the truth about the abuse because she did not want her children "to be taken again." Mother agreed she was not protective of her children when she did not believe Callie when Callie told Mother in September 2021 that Father touched her. Mother stated: "I did not believe her because I did not see anything with my eyes. I did not – I did not witness anything. So, no, I did not believe my daughter." Mother also stated "my first daughter lies so much I didn't believe her."

At trial, Mother claimed that she now believes her daughters and that she has taken action to remove Father from the home, and she stated she has called the police on him at least half a dozen times after she learned of the allegations.

The CASA Volunteer Coordinator testified that she received a phone call from Mother on February 13, 2023, just days before trial, where Mother stated she did not believe Callie's or Amy's allegations against Father, and that Mother told her she "didn't see any reason" to kick Father out of the home following Callie's outcry.

A family plan of service was created for Mother and made an order of the court. Although it took Mother five months to begin services, she did ultimately complete services. Part of the services included counselling and the notes from Mother's sessions were admitted as an exhibit during trial. The counselling notes contain statements that Mother's progress "is minimal at best" and that Mother "has a mind-set of 'fabricated information' related to her life and family."

Mother completed a psychological evaluation with Dr. Amin, whose report was admitted as an exhibit during trial. Dr. Amin diagnosed Mother with bipolar I disorder, generalized anxiety disorder, mild intellectual disability, severe unknown substance abuse disorder in remission, and other specified personality disorders (narcissistic, histrionic, and dependent personality features). Dr. Amin's report noted that Mother

has not adequately met the medical, emotional, or welfare needs of her children, primarily due to her drug use, lack of support and general knowledge regarding child development and childrearing practices. Many responsibilities that are necessary to maintain a self-sufficient, "routine", adult lifestyle…have not been met effectively by the mother. Her own sense of affection and bonding with her children has been impacted by her psychiatric problems, lack of insight, drug history, lack of parenting skills, lack of involvement, and lack of support.

Dr. Amin's report also expressed concerns about reunification. The report concluded that Mother "has been unable to show that she is a psychologically capable, socially competent, sober, financially independent, mature adult who is able to prioritize the welfare and safety of her children in all areas long-term."

Mother admitted at trial that she has a lengthy history of drug use. Mother's Spindletop Center records which were admitted into evidence at trial reflect that she has a history of using marijuana, cocaine, meth, and ecstasy, and Mother reported she stopped using cocaine, meth, and ecstasy after her children were born. That said, Mother admitted in her testimony at trial that she "probably" used meth during the pendency of this case. Department records reflect that while the case was being investigated and when caseworkers visited Mother's home, it smelled of marijuana. The trial court also heard testimony that Mother smelled of

marijuana when she came to the Department's office. Mother also reported she had been taking Xanax pills even though she didn't have a prescription for the pills.

The trial court also heard Mother admit she tested positive for drugs on a July 2022 hair follicle test. At the time of the positive drug test, Mother was also pregnant with another child, *Pat*, who is not one of the children named in this termination. Mother agreed that *Blake* is the father of Pat, and that Blake has a lengthy criminal history, including charges for harassment of a public servant in a correction or detention facility and felony possession of a controlled substance, namely PCP.

The Father of the children who are subjects of this suit also had gone to prison for selling drugs; and Mother and Father used to smoke PCP together. Father currently has charges pending for the sexual assault of his children.

Mother confessed to having an extensive criminal history, but she stated her last criminal charge was almost thirteen years ago. Mother admitted her criminal history included three charges for prostitution, at least three charges for trespassing, possession of a controlled substance, theft, unauthorized use of a motor vehicle, terroristic threats, two

8

charges for failure to ID, assault, and for the manufacture or delivery of a controlled substance. She served two years in jail for drug charges. Mother testified she has been rehabilitated and denied that her criminal history shows she makes bad decisions.

The evidence before the trial court also included testimony about the children's current placements. Living testified that the children were safe in their current placements, their needs were being met, and their placements were able to be protective. Living testified that, although not a long-term option, the foster home where Amy is placed is able to meet her mental health needs. The three boys are placed with their maternal grandmother, who is willing to be a forever home for them. Anna is placed with a caregiver that is dealing with health issues, so Anna will be returning to foster care. The children who were old enough to speak each stated they did not wish to return to their Mother. Amy stated during the Garth House interview that she did not want to live with Mother and Father.

Living, the CASA, and the CASA Volunteer Coordinator each recommended that the trial court terminate Mother's parental rights to the children. Living cited Mother's inability to protect the children and

9

that the children's safety remained a concern. The CASA Volunteer Coordinator stated that Mother was not protective of the children, and the CASA Volunteer Coordinator did not believe Mother would be able to implement the things she's learned to parent the children. The CASA opined that termination was in the children's best interest, as it was clear to her that the "children are not in – as a priority in [Mother's] life. It seems like she still has doubt about believing her children and their outcries, and that is a very big concern."

At the conclusion of the trial, the trial court signed an order terminating the parent-child relationship as to Mother and Father with Amy, Dennis, Damien, Anna, and Drew. The trial court found by clear and convincing evidence that the predicate statutory grounds in subsections D and E of the Family Code were met,[5] and also found by clear and convincing evidence that termination is in the children's best interest. The trial court also found that terminating Mother's and Father's rights to Amy, Dennis, Damien, Anna, and Drew is in their best interest. Mother appealed from the trial court's order.

---

[5] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

## Standard of Review

At trial, the Department had the burden to prove the allegations in its petition by clear and convincing evidence.[6] As defined by the Family Code, *clear and convincing evidence* "means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[7] In a case tried to the bench, the trial court acts as the factfinder, determines what witnesses are credible, decides what weight to give the testimony, and is free to resolve the inconsistencies that may exist in the testimony.[8]

Under a legal-sufficiency review, we determine whether "a reasonable trier of fact could have formed a firm belief or conviction that its finding was true."[9] In reviewing the evidence, we "look at all the evidence in the light most favorable to the finding[,]" "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so[,]" and "disregard all evidence that a reasonable

---

[6] *See id.* § 161.001(b); *In re J.W.*, 645 S.W.3d 726, 740-41 (Tex. 2022).

[7] Tex. Fam. Code Ann. § 101.007.

[8] *See Iliff v. Iliff*, 339 S.W.3d 74, 83 (Tex. 2011); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005).

[9] *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

factfinder could have disbelieved or found to have been incredible."[10] Still, in our review we will not disregard "undisputed facts that do not support the finding" that a party is challenging in an appeal.[11] When deciding whether a reasonable trier of fact could have formed a firm belief or conviction that the evidence supports a finding challenged in an appeal, we defer to the factfinder's role as the "'sole arbiter of the witnesses' credibility and demeanor[]'" when the inferences the factfinder drew from the evidence before the factfinder were reasonable.[12]

When conducting a factual-sufficiency review, we "give due deference" to the findings that are based on the direct and circumstantial evidence admitted by the trial court in the trial.[13] In a factual sufficiency review, the question we must decide is not what we would have found from the evidence had we been seated as the factfinder.[14] Rather the question is whether from the evidence as a whole the factfinder could

---

[10] *Id.*

[11] *Id.*

[12] *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2012) (quoting *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009)); *see In re J.W.*, 645 S.W.3d at 741.

[13] *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (cleaned up).

[14] Id.

"reasonably form a firm belief or conviction about the truth of the [Department's] allegations."[15]

On appeal, to support an argument that the evidence is factually insufficient to support a finding, the parent challenging the finding should explain why the factfinder could not have credited the evidence the parent challenges in favor of the finding the parent disputes.[16] A reviewing court will not find the evidence factually insufficient unless "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction[]" in favor of its finding.[17]

<u>Sufficiency of the Evidence—Endangerment Findings</u>

In issues one and two, Mother argues the evidence is legally and factually insufficient to support the trial court's findings of condition endangerment and conduct endangerment outlined in subsections 161.001(b)(1)(D) and (E).[18] While similar, subsections D and E are not

---

[15] *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).
[16] See *In re J.F.C.*, 96 S.W.3d at 266.
[17] *Id.* at 267.
[18] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

13

identical. Under subsection D, the Department had to prove, by clear and convincing evidence, that Mother knowingly placed the children or allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being.[19] Under subsection E, the Department needed to prove, by clear and convincing evidence, that Mother knowingly placed the children with a person or allowed them to remain in a condition with a person who engaged in conduct that endangered their well-being.[20] Under either subsection D or E, the term *endanger* means "'expose to loss or injury; to jeopardize.'"[21] Generally, a parent's conduct that subjects a child to a life of uncertainty and instability endangers a child's physical and emotional well-being;[22] however, "it is not necessary that the conduct be directed at the child or that the child actually suffers injury."[23]

---

[19] *See id.* § 161.001(b)(1)(D).

[20] *See id.* § 161.001(b)(1)(E).

[21] *In re J.F.-G.*, 627 S.W.3d at 313 (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (citing *Endanger*, Webster's New Twentieth Century Dictionary of the English Language 599 (1976))).

[22] *See In re J.O.A.*, 283 S.W.3d at 345 n.4 (citing *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)).

[23] *Boyd*, 727 S.W.2d at 533.

Often, evidence used to establish violations of subsections D and E overlaps. Subsection D does not require evidence that a parent engaged in conduct multiple times, and evidence that a parent engaged in either acts or omissions that endangered a child, even a single act or omission, may suffice.[24] Allegations involving subsection D violations require that courts examine the period before the Department removed the child from the home to evaluate the parent that placed or allowed the child to remain in a condition that endangered the child's physical or emotional well-being.[25] In contrast, allegations involving subsection E violations, may be "based on conduct both before and after removal."[26]

"Without question, sexual abuse is conduct that endangers a child's physical or emotional well-being."[27] Sexual abuse of one child in the home endangers the physical and emotional well-being of the abused child as well as other children in the same home who may discover the abuse or

---

[24] *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.) (citing *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied)).

[25] *Id.* (citing *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.)).

[26] *In re A.L.H.*, 515 S.W.3d 60, 93 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (citing *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)).

[27] *In re L.C.*, 145 S.W.3d at 796.

may be abused themselves.[28] "Parental knowledge that an actual offense has occurred is not necessary; it is sufficient that the parent was aware of the potential for danger and disregarded that risk."[29]

The record reveals ample evidence that Mother, at a minimum, knew of the potential danger of sexual abuse of her children by Father and failed to adequately protect the children from that risk. Mother admitted that Callie told her in September 2021 that Father sexually abused her. Despite Callie's outcries, Mother refused to believe Callie because she did not see the sexual abuse with her own eyes. Mother admitted she failed to remove Father from the home but blamed this action on the Department because she said they did not tell her he could not be in the home.

After Mother failed to remove Father from the home, Amy made an outcry of sexual abuse against Father in January 2022. Testimony at trial showed that Mother was present in the next bedroom when the sexual abuse of Amy took place. Amy stated that Mother told her to lie about the sexual abuse and Mother admitted she told her "not to tell the

---

[28] *Id.*
[29] *Id.*

truth" because Mother did not want her children to be removed. Though Mother said at trial that she now believes Callie and Amy, a telephone call Mother had just before trial indicated Mother still doubted Callie's and Amy's outcries. Mother also admitted at trial that she failed to protect the children.

The record also reveals endangering conditions other than those relating to sexual abuse. The evidence at trial showed that Mother had a long drug history with use of marijuana, cocaine, ecstasy, PCP, and meth. Although Mother claimed to have stopped using drugs, she admitted that she likely used meth during the pendency of this case and the record shows she tested positive for drugs during this case and while she was pregnant with another child. The evidence of Mother's drug use and continued drug use during the pendency of the case permitted the trial court to conclude that she engaged in conduct that subjected her children "to a life of uncertainty and instability, thereby endangering their physical and emotional well-being."[30]

We conclude the evidence is legally and factually sufficient to support the trial court's finding that the Department established by clear

---

[30] *See In re A.B.*, 125 S.W.3d at 777.

and convincing evidence that Mother committed the predicate acts enumerated in subsections D and E. We overrule Mother's first and second issues.

Sufficiency of the Evidence–the Best-Interest Finding

In her third issue, Mother contends the evidence is legally and factually insufficient to support the trial court's finding that termination of Mother's parental rights is in the children's best interest. When deciding whether terminating a parent's rights is in a child's best interest, the inquiry is necessarily "child-centered and focuses on the child's well-being, safety, and development."[31] Generally, when examining the evidence supporting a best-interest finding, we compare the evidence admitted in a trial against the nonexclusive factors the Texas Supreme Court identified in *Holley v. Adams*.[32] The evidence that

---

[31] *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018).

[32] *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). In *Holley*, the Texas Supreme Court used these factors when reviewing the best-interest finding:

- The child's desires;

- The child's emotional and physical needs, now and in the future;

- The emotional and physical danger to the child, now and in the future;

18

relates to a factfinder's normal decision-making process in finding what is in a specific child's best interest need not include evidence addressing all nine *Holley* factors.[33]

Under the Family Code, there is a strong presumption that keeping a child with a parent is in the child's best interest.[34] Even so, it is also presumed "the prompt and permanent placement of the child in a safe environment is…in the child's best interest."[35]

---

- The parenting abilities of the parties seeking custody;
- The programs available to assist the party seeking custody;
- The plans for the child by the parties seeking custody;
- The stability of the home or the proposed placement;
- The parent's acts or omissions that reveal the existing parent-child relationship is improper; and
- Any excuse for the parent's acts or omissions.

[33] *In re C.H.*, 89 S.W.3d at 27 (noting the lack of evidence on some *Holley* factors "would not preclude a factfinder from reasonably forming a strong belief or conviction that termination is in the child's best interest[]").

[34] Tex. Fam. Code Ann. § 153.131(b); *see also In R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (noting that a "strong presumption" exists favoring keeping a child with the child's parent).

[35] Tex. Fam. Code Ann. § 263.307(a).

In a best-interest analysis, the focus is on the best interest of the child, not the best interest of the parent.[36] Often, the evidence that supports the predicate findings on the D and E grounds may also support the trial court's best-interest finding.[37] And the Department need not present evidence to support each of the *Holley* factors, as the lack of evidence on some factors will not preclude the factfinder from forming a strong conviction that terminating the parent-child relationship is in a child's best interest, particularly when the evidence is undisputed that the parent endangered the child.[38] As the reviewing court, the question we must decide is whether the record, when considered as a whole, supports the trial court's best-interest finding.[39]

As already mentioned, the trial court found that Mother endangered her children based on the evidence presented at trial. The trial court could have reasonably concluded that—terminating Mother's

---

[36] *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

[37] *In re T.R.S.*, No. 09-18-00482-CV, 2019 WL 2455273, at *5 (Tex. App.—Beaumont June 13, 2019, no pet.) (mem. op.) ("The same evidence that supports a trial court's findings under subsections D, E, . . . may also be relevant to the trial court's best-interest finding.").

[38] *In re C.H.*, 89 S.W.3d at 27.

[39] *Id.* at 28.

parental rights was required to prevent Mother from endangering her children again, Mother failed to protect her children from sexual abuse by Father, Mother told Amy to lie about the abuse to keep Father in the house, and Mother admitted just before trial that she still did not believe the outcries from her daughters.

The trial court heard testimony the children were safe in their current placements, their needs were being met, and their placements were able to be protective. Although not a long-term option, Amy is currently placed in a foster home that is able to meet her mental health needs. The three boys are placed with their maternal grandmother, who is willing to be a forever home for them. Anna is currently placed with a caregiver that is dealing with health issues and will be returning to foster care. The children who were old enough to verbalize their desires each stated they did not wish to return to their Mother. Amy stated during the Garth House interview that she did not want to live with Mother and Father.

During the case, Mother was not allowed visitation with her children because of the sexual abuse allegations and her inability to be protective. While in Mother's care, Mother reported that Dennis had to

repeat kindergarten and defecated on himself and was still in a diaper at seven years old, but she did not take him to a doctor for those problems. The service plan also reflected concerns that Amy was in a caregiver role. Mother testified that she did not know that Amy was suffering from nightmares and anger issues about the sexual abuse.

A parent's past conduct is relevant to a trial court's decision about what is in a child's best interest.[40] As already discussed, the trial court heard evidence that Mother had drug use issues that continued during the pendency of this case. Mother continued to associate with men who have criminal charges and who used drugs. In fact, Mother admitted she used drugs during her pregnancy with Pat, who as we previously mentioned is not one of the children the Department named in this suit.[41] Likewise, Dr. Amin's report indicates that Mother has untreated mental health issues that Mother is unlikely to address, and Mother has substance abuse issues for which Mother is not likely to seek long-term care.

---

[40] *Id.* at 27-28.

[41] Pat was born after the Department received a report in January 2022 alleging that Father was abusing Amy and after the Department opened the investigation that resulted in the judgment at issue in this appeal.

Deferring to the trial court's role as the sole arbiter of the facts, we conclude the record contains legally and factually sufficient evidence to support the trial court's best-interest finding.[42] We overrule Mother's third issue.

<u>Conclusion</u>

Because Mother's issues lack merit, the trial court's judgment is AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on June 20, 2023
Opinion Delivered August 3, 2023

Before Golemon, C.J., Horton and Johnson, JJ.

---

[42] *See* Tex. Fam. Code Ann. §§ 161.001(b)(2), 263.307(a); *see also In re J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371-72.