

# NUMBER 13-24-00632-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF I.R. JR. AND J.R., CHILDREN

## ON APPEAL FROM THE COUNTY COURT AT LAW NO. 5 OF NUECES COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Justices Silva, Peña, and Fonseca
Memorandum Opinion by Justice Silva**

Appellant I.R. (Father) appeals the trial court's order terminating the parent-child relationship with respect to his minor children I.R. Jr. ("Ivan") and J.R. ("Jack").[1] By two issues, Father challenges: (1) the sufficiency of the evidence supporting the enumerated

---

[1] To protect the identities of the children subject to this suit, we refer to the children and their relatives by initials and pseudonyms. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

grounds for termination; and (2) the trial court's finding that termination was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1), (b)(2). We affirm.

## I. BACKGROUND

The Texas Department of Family and Protective Services (the Department) filed a petition to terminate the parent-child relationship which was largely predicated on its four-year history with A.C. (Mother)[2] and Father, which we summarize below.

The Department was first introduced to the family in October 2018, following reports of neglectful supervision of Ivan and Jack. There were allegations of domestic violence between Father and Mother and the case was closed due to the children being under their paternal grandmother's care.

In November 2019, the Department received a report of neglectful supervision of Ivan, Jack, and their sister, I.R. ("Jane").[3] Mother reported to law enforcement that Father threatened her with a knife. Ivan was interviewed about the incident and stated that he witnessed his Father break a door. The Department determined that there was reason to believe the children had been neglectfully supervised by Father. The Department referred the family for family-based safety services (FBSS). Father failed to alleviate the Department's concerns by neither participating in nor completing those services.

In April 2020, the Department received another report regarding Father. It was alleged that there was ongoing domestic violence between Father and Mother in front of the children which resulted in Father's arrest. The Department found that Father and Mother were neglectful in their supervision of their children. After paternal grandmother

---

[2] The trial court's order also involuntarily terminated the parental rights of Mother, who is not a party to this appeal.

[3] Jane was a biological child of Mother and Father. Jane passed away in February 2021.

was killed, Mother recommended Ivan be placed with his paternal aunt and that Jack and Jane be placed with family friends in Austin. While Jack and Jane were in the custody of the family friends in Austin, it was reported that they were being physically abused and neglected. The injuries to Jane were so severe that she passed away.

The Department intervened again and removed Ivan and Jack from Father and Mother's home in 2021. The Department determined that there was reason to believe Father and Mother had neglectfully supervised their children. Moreover, according to Department, Father did not complete his court-ordered services. The trial court ordered the children returned to Mother's care in 2022 over the Department's objections.

In January 2023, the Department received new allegations that Mother physically abused and neglectfully supervised Ivan and Jack. According to the removal affidavit, Jack was transported to Driscoll Children's Hospital where he received stiches due to a laceration on his head. It was further reported that Mother suffered from mental health issues and displayed erratic behavior. There were also concerns that Mother was not taking her medications as prescribed. The Department received a subsequent report that Mother was abusing illegal drugs.

The Department attempted to contact Mother, the children, and the maternal grandmother at their home. Mother refused to allow the Department into the home to assess the children. Instead, the Department met with Mother outside her home to discuss the incident leading to Jack's hospitalization. She denied the allegations against her. Mother explained that she heard someone banging on her door and yelling outside her home. She stated she attempted to "grab" Jack and he fell. The Department asked if the children could be interviewed at the Child Advocacy Center (CAC) and Mother agreed

3

that the Department could transport the children to be interviewed. On January 11, 2023, the Department arrived at Mother's home, but she declined to allow the children to be interviewed at the CAC without a court order. Later in the day, family members reached out to the Department expressing their concerns over Mother's mental health. Mother was eventually admitted to a mental health facility and agreed to allow the children to stay with their maternal uncle and aunt. The family transported the children to be interviewed at the CAC on January 19, 2023. Ivan outcried that Mother hit Jack with an "object" which resulted in the laceration.

The Department thereafter removed the children from their home and filed its petition to terminate Mother's and Father's parental rights on January 24, 2023. The petition included an affidavit setting forth the parties' history with the Department as set forth above. After several permanency hearings, the case proceeded to a bench trial on July 15, 2024, where the following evidence was adduced.[4]

At trial, Department caseworker Ashley Banda testified that she was the primary conservatorship worker for Ivan, who was born December 11, 2013, and Jack, who was born August 11, 2017. She described that the Department became involved with the family when Jack was taken to the hospital with a "2.5 [centimeter] laceration to his head," which Mother alleged occurred because Jack "fell." She stated that Ivan outcried that he "witnessed his mother hit [Jack] over the head and he was terrified." Ivan and Jack were removed and placed into foster care.

---

[4] The termination order incorrectly lists the trial dates as July 15, 2024, September 23, 2024, and October 10, 2024. The record reflects that the trial court heard this matter on July 15, 2024, September 16, 2024, and September 23, 2024. The trial court thereafter took the matter under advisement and sent an email to the parties regarding its ruling on October 10, 2024. On November 25, 2024, the trial court signed the termination order.

4

Banda testified that the Department was concerned about the ongoing domestic violence between Mother and Father. She stated that after Father was released from jail, there was "[a] lot of domestic violence," including five calls to law enforcement. Banda testified she witnessed some incidents first-hand, including an encounter between Mother and Father where "they were arguing back and forth" in the living room. Banda testified that it "got a little confrontational . . . verbally," and that the argument was centered on "the case,[] the kids, and how they needed to work out their problems." She detailed another incident in which she tried to visit Mother's home but left because there was no answer at the door. After leaving, she received a phone call from Father asking her to "please go back" to Mother's home because "[Mother] wasn't allowing him to leave her home." Banda returned with two other caseworkers and observed Mother and Father arguing. She stated that "there was a lot of screaming and it seemed like [Father] was trying to open the door, . . . but couldn't." After Father exited the home, Banda observed Mother pick up her phone and proclaim that she was "calling the cops." Mother stated that "she was being harassed" and "hit" by Father and that "she wanted him out of her home." Banda suggested to Father that he remain at the location until law enforcement arrived "so we can explain to the cops what happened," to which he responded, "please, I don't want to be here. . . . I don't want any problems." Mother stated to Banda that "she was just having an episode" and "[i]t was no big deal."

Banda also testified regarding Father's progress throughout the pendency of the case. She stated he was "communicative with the Department" and completed "his family plan of service[] with the exception of a couple of individual counseling [requirements] due to his incarceration." Banda elaborated that the Department's concerns with Father

stem from the "[o]ngoing domestic violence" and "possible drug use" since he failed to submit to random drug testing upon request. She stated that "his only drug test . . . was in July of 2023," and that he tested positive for methamphetamines at that time.

Banda testified that Ivan and Jack expressed "that they're just desperately . . . hoping that they will not be returned" to their parents. She stated that she met with Ivan and Jack "monthly," and that the last time she visited with the children, Ivan "expressed that he would definitely not want to be reunified with his parents." Banda also testified that Jack stated "that he didn't want to go back home with Mommy or Daddy." She explained that there were "two occasions" where Ivan changed his mind; during one visit Ivan expressed that he was "excited to see [his] mom," but then "he changed his mind completely and he said [he did not] want to go home anymore." Banda tried to address the issue with the children but Ivan would "shake his head" and "cry hysterically" asking her "to please not take him back." She said that Ivan expressed "he wouldn't mind living with his father," but "he didn't trust his father not to allow his mother in the home and that scared him." Banda also testified that the children attended "two or three sessions" of family counseling with their parents, but the family counseling ceased because the children "refused to get in [Banda's] vehicle." Banda stated that the last visit Ivan and Jack had with their parents was "[a] few months before July, maybe."

Department investigator Briana Rodriguez testified that the Department filed for removal of the children "after speaking with several family members" who expressed "concerns for Mother." Rodriguez said that Ivan made an outcry statement at the CAC, stating he "[saw] his mother hitting his younger brother over the head" and that "he was scared." Rodriguez described the family's history with the Department which included

6

drug use and domestic violence. She testified that Ivan and Jack had previously been removed from their parents' care and that Mother and Father were provided services in the past but did not complete them nor alleviate the Department's concerns. Specifically, Mother and Father failed to consistently submit to drug testing.

M.H.C., the children's maternal grandmother, testified that the children expressed that "[they] don't want [Mother and Father] arguing" or "fighting." M.H.C. stated that Ivan "has been evaluated for depression," and Jack "still urinates and wears a diaper at night" and has "speech therapy problems." She testified that she "tried to locate [Father]" because she "want[s] the family to be together." She said that she would be "willing to take the[] children into [her] home and care for them."

J.A. testified that she is married to Mother's brother, D.C. She stated that Mother tried to admit herself into the hospital to address her mental health issues. Mother allowed Ivan and Jack to stay with J.A. and D.C. while Mother sought treatment. However, the Department removed the children from J.A.'s home shortly thereafter. J.A. testified that she participated in a home study, but the "problem with the home study" was that D.C. had an arrest for child endangerment fifteen years prior. She explained that he "was in a car accident with his son," and the child was not restrained. J.A. also testified that the children "need to be with family" because she did not "feel that they should be in the foster care system." J.A. further testified that "at some point" she would return the children to their parents and was "willing to give them time so that they can get it together."

Court Appointed Special Advocate Patricia Bates testified that she has been assigned to Ivan and Jack's case for "almost four years." She was appointed by the trial

court to represent the best interests of the children. Ivan and Jack were ten and seven years old, respectively, at the time of Bate's testimony. Bates testified that:

> When [she] went through the [family's] file, [she] remember[ed] thinking that the amount of violence in these children's lives was something that I hadn't seen a lot of. I felt for them to feel safe in any environment was going to take a lot of work. The drug use that was apparent within the home and within the people that they were in contact with regularly was very significant. They were behind in their learning because of neglect, and the trauma that the family in general . . . had experienced was so significant.

Bates explained that after Father's mother was "killed in the apartment next door to them[,] . . . the parents placed their children with family members." She stated that Ivan and Jack's sister passed away while staying with family friends.

Regarding the parents' progress, Bates testified that "the parents have not maintained sobriety since the first intake in 2019." She further testified that Father had "never done a hair follicle [drug test]" despite agreeing to do so, and that he had "been consistently in and out of jail so he cannot . . . provide a level of safety for the boys." Bates stated that Father "reach[ed] out to [her] asking if he could attend drug court," but was declined because "the case had progressed too long."

Bates said that "the level of violence between [Father] and [Mother] has continued its cycle," and that the parties "completely downplay the effect, the trauma, not only to themselves, but to the boys, of living in a continual home with continual violence . . . from both parents." She stated that they do not "have the tools to deal with any kind of conflict without resorting to physical violence." Bates admitted on cross-examination that she had never personally observed any violence between Mother and Father. However, she explained that "[o]ne pattern [she] observed frequently was when [Father] would come back into [Mother's] life," she noticed that "[a] very swift deterioration [in their relationship] would happen." She explained it was hard to meet with Father for the "first two years" of

8

the case. Additionally, Father "did not have any contact with his children for . . . the whole two years." When she finally met with Father, he expressed a willingness to change for the children; however, he "did not follow through." Bates stated that Father is currently in jail due to family violence.

Bates testified she has visited the children in their current foster placement and the children "feel very safe." She visits them on a monthly basis and has regular phone contact. Bates testified that the foster home is "not an adoptive placement." She stated Ivan and Jack did not have consistent schooling prior to being placed in foster care, and she opined that this "add[ed] to the inconsistency that the children have experienced." She testified that Jack does not speak a lot but he is aware of the case and "shared with [her] some very specific things about the abuse he experienced." She also testified that Ivan's "level of advocacy for himself has increased."

Bates emphasized that "[Ivan] recognizes that [Mother and Father] cannot provide a safe home for him. He knows that so vehemently, that it almost makes him sick to think about the possibility of going home to his parents." She stated that Ivan "does not want to live with his father" and that "he started getting uncomfortable with the phone visits." Bates testified that the week prior to trial, Ivan approached a "social worker at the school" and expressed that he "need[ed] some help" due to having "so much anxiety . . . because [he] could possibly go home to [his] parents." She explained that "[Ivan] has been reaching out since he was [five] years old for help," and has expressed to her that "he does not want to live with his parents." Bates testified that Ivan is "scared about the results of the trial" and was "really worried for his brother [because h]e doesn't know that he can keep his brother safe with his parents." She believed the children would not "feel safe if they

were returned" to Father. Bates agreed that "the children would experience impairment or harm to their emotional or physical well-being if they were placed" with Father. She also testified that family members would not be an appropriate placement for the children. Bates recommended that the parental rights be terminated.

Mother testified that she suffers from "PTSD," "anxiety," "depression," "stress" "schizophrenia," "bipolar [disorder]," and "hallucinations." She has told the children that she suffers from mental health issues. Mother admitted to relapsing, but stated that it did not "mean that [she is] a full[-]blown drug addict." She acknowledged domestic violence and verbal disagreements with Father. Mother testified that she has called 9-1-1 in the past because they were having "some domestic issues." She stated that although she "does not get along with [Father] and [they] cannot live together," she thinks they can coparent. Mother admitted that Father "violated court orders prohibiting him from going" to her home. She testified that she placed the children outside her home "because [Father's mother] was murdered next door and [they were] under investigation." Mother further testified that Ivan accused her and Father of "kill[ing] his grandmother" by "sho[o]t[ing] her." When Mother was questioned how Jack received his injuries which resulted in the children's removal, she responded that "he fell" and "bumped his head."

After the multi-day bench trial concluded, the trial court terminated Father's parental rights to Ivan and Jack under predicate grounds (D), (E), (N), and (O). *See id*. § 161.001(b)(1)(D), (E), (N), (O). The trial court also found that termination was in the children's best interest. *See id*. § 161.001(b)(2). This appeal followed.

10

## II.   STANDARD OF REVIEW

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi–Edinburg 2010, no pet.); *see In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring) ("Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases."). Accordingly, "termination proceedings must be strictly scrutinized." *In re K.M.L.*, 443 S.W.3d at 112. In such cases, due process requires application of the "clear and convincing" standard of proof. *Id.* (citing *Santosky v. Kramer*, 455 U.S. 960, 769 (1981)). This intermediate standard falls between the preponderance of the evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re L.J.N.*, 329 S.W.3d at 671. It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007. A parent's rights to their child may be terminated upon a showing by clear and convincing evidence that (1) he or she engaged in certain acts or omissions prescribed by statute, and (2) termination is in the child's best interest. *Id.* § 161.001(b).

When reviewing the legal sufficiency of the evidence supporting termination, we "should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume "the

factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* Ultimately, we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible" while considering "undisputed facts that do not support the finding[.]" *Id.* If we determine that "no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then [we] must conclude that the evidence is legally insufficient." *Id.*

When reviewing the factual sufficiency of the evidence supporting termination, we ask "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department]'s allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In conducting this review, we consider whether "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

Under both standards, we defer to the trier of fact's determinations on the credibility of the witnesses "so long as those determinations are not themselves unreasonable." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *see In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam); *see also In re C.H.*, 89 S.W.3d at 26 ("A standard that focuses on whether a reasonable jury could form a firm conviction or belief retains the deference an appellate court must have for the factfinder's role."). "In a bench trial, the trial court acts as the fact-finder and is the sole judge of witness credibility." *In re A.M.*, 418 S.W.3d 830, 841 (Tex. App.—Dallas 2013, no pet.) (citing *Nguyen v. Nguyen*, 355 S.W.3d 82, 88 (Tex. App.—Houston [1st Dist.] 2011, pet. denied)). "The fact-finder may

choose to believe one witness over another, and we may not impose our own opinion to the contrary." *Id.* (citing *Nguyen*, 355 S.W.3d at 88).

### III.    PREDICATE TERMINATION GROUNDS

Father challenges the evidence as legally and factually insufficient to support the grounds for termination.

### A.    Applicable Law

Although only one predicate ground is necessary to support termination, when the parent has preserved error as to Subsections (D) and (E), concerning endangerment, we must review those grounds as matter of due process. *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022); *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam) (holding that regardless of whether the termination judgment could be affirmed on another ground, due process requires that an appellate court detail its analysis for an appeal of termination of parental rights under Subsections (D) and (E)).

Among the predicate grounds for termination is that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" or "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). The primary difference between Subsections (D) and (E) is that Subsection (D) focuses on the child's conditions or surroundings, while Subsection (E) focuses on the parent's or another's conduct whether by overt act or by omission. *In re A.L.H.*, 624 S.W.3d 47, 56 (Tex. App.—El Paso 2021, no pet.). However, the same evidence may support a finding under either subsection depending on the circumstances. *Id.* (providing the example of

13

continued domestic violence in the home with the children as grounds under both Subsections (D) and (E)). "[E]ndangerment encompasses 'more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment.'" *In re D.L.W.W.*, 617 S.W.3d 64, 78 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "[E]ndanger means to expose to loss or injury; to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *Boyd*, 727 S.W.2d at 533)

Under Subsection (D), "we must examine the time before the children's removal to determine whether the environment itself posed a danger to the [children]'s physical or emotional well-being." *In re L.W.*, 609 S.W.3d 189, 199–200 (Tex. App.—Texarkana 2020, no pet.) (quoting *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.)). The children's physical health or emotional well-being is endangered when the parent fails to remove them from a home in which abusive or violent conduct is occurring. *Id*. "Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the child's home can create an environment that endangers the physical and emotional well-being of a child as required for termination under [S]ubsection D." *In re P.N.T.*, 580 S.W.3d 331, 355 (Tex. App.—Houston [14th Dist.] 2019, pet. denied).

Subsection (E) focuses on the parent's conduct rather than the children's conditions; it does not require merely a single act or omission, but instead requires a "voluntary, deliberate, and conscious course of conduct by the parent." *In re A.L.H.*, 624 S.W.3d at 56 (citing *In re K.A.C.*, 594 S.W.3d 364, 372–73 (Tex. App.—El Paso 2019, no pet.)). "A parent's abuse of a child endangers that child but also endangers other children the parent may have in his care." *In re P.N.T.*, 580 S.W.3d at 356 (citing *In re E.C.R.*, 402

S.W.3d 239, 248 (Tex. 2013)). Moreover, "[a] parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Id.*; *see In re L.W.*, 609 S.W.3d at 200; *see also In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at *5–7 (Tex. App.—Fort Worth Feb. 18, 2022, pet. denied) (mem. op.) (considering parent's failure to complete drug treatment, failure to maintain a stable home and employment, failure to attend regularly scheduled visits, failure to emotionally and financially support the child, and repeated arrests as endangering to the child).

Drug use may also create a dangerous environment for the children. *In re J.S.*, 675 S.W.3d at 128; *In re L.W.*, 609 S.W.3d at 200.

> [I]llegal drug use alone may not be sufficient to show endangerment, [but] a pattern of drug use accompanied by circumstances that indicate related dangers to the child[ren] can establish a substantial *risk* of harm. A reviewing court should not evaluate drug-use evidence in isolation; rather, it should consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's "ability to parent."

*In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024) (quoting *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009)).

### B.    Analysis

#### 1.    Subsection (D)

Father challenges the sufficiency of the evidence supporting Subsection (D), arguing the Department failed to show "[F]ather knew of the condition in which the children were living at the time [Jack] was taken to the hospital or at the time of removal." Moreover, Father also argues "there was no evidence [he] knew [Mother] had stopped" taking her prescribed medication. Subsection (D) requires us to look at the children's environment prior to removal. *See In re L.W.*, 609 S.W.3d at 199–200. The undisputed evidence shows that Father engaged in domestic violence and drug use while living with

15

the children. *See id.* ("[A] parent's failure to remove [himself] and [his] children from a violent relationship endangers the physical or emotional well-being of the children[.]"); *In re J.O.A.*, 283 S.W.3d at 345 ("[A] pattern of drug use accompanied by circumstances that indicate related dangers to the child[ren] can establish a substantial *risk* of harm[.]").

The evidence introduced at trial detailed Father's history with the Department, including various incidents involving law enforcement. Mother testified that she and Father have a history of domestic violence and that Father has previously violated court orders prohibiting him from going to her home. She further testified that she called 9-1-1 because they were having "some domestic issues." Moreover, Mother admitted to placing the children outside her home when Father's mother was "murdered next door and [they] were] under investigation." Mother also acknowledged drug use.

Banda testified that after Father was released from jail during the pendency of this case, she observed a specific incident where Mother and Father were screaming at each other and Father "was trying to open the door" to exit the home but was unable to. She also observed Mother cry out that "she was being harassed by [Father] and she wanted him out of her home," and was "being hit." Ivan expressed to Banda that "he didn't trust his father not to allow his mother in the home and that scared him." M.H.C. testified Ivan and Jack expressed to her they did not want their parents "arguing" or "fighting."

Bates testified Mother and Father had a "history of domestic violence," along with "drug use" and "neglect of the children in many ways." She stated that "the children would experience impairment or harm to their emotional or physical well-being if they were placed with their parents."

16

Although Father's argument does not differentiate between legal and factual sufficiency, we nonetheless conclude the evidence is both legally and factually sufficient to support termination under Subsection (D). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D); *In re J.F.C.*, 96 S.W.3d at 266–67.

### 2. Subsection (E)

Next, Father argues the evidence is insufficient to support termination under Subsection (E) because the Department failed to show that Father's "behaviors . . . would endanger or did endanger the children at the time of removal." Moreover, Father argues he did not "kn[o]w of the dangerous conditions created by Mo[ther]."

We disagree that the Department did not present evidence that would support the trial court's finding under Subsection (E). As noted *supra*, both Mother and Father engaged in domestic violence. Although Father completed his family plan of service, he only drug tested once with a positive result for methamphetamines. *See In re J.W.*, 645 S.W.3d at 734 (factfinder presumed parent's missed drug tests would have been positive under the service plan); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (noting that a parent's use of illegal drugs may constitute endangering conduct because "it exposes the child to the possibility that the parent may be impaired or imprisoned"); *In re A.M.*, 495 S.W.3d 573, 579–80 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) ("Because it significantly harms the parenting relationship, drug activity can constitute endangerment even if it transpires outside the child's presence.").

While Father again did not differentiate between legal and factual sufficiency, we nonetheless conclude the evidence is both legally and factually sufficient to support

termination under Subsection (E). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D); *In re J.F.C.*, 96 S.W.3d at 266–67. Father's first issue is overruled.[5]

## IV. BEST INTEREST

### A. Applicable Law

The best-interest prong of the termination inquiry "is child-centered and focuses on the child's well-being, safety, and development." *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). The Supreme Court of Texas has identified several nonexclusive factors for courts to consider in determining the children's best interest, known as the *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include: (1) the children's desires; (2) the children's present and future emotional and physical needs; (3) the present and future emotional and physical danger to the children; (4) the parenting abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the children's best interest; (6) the plans for the children by those individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-children relationship is an improper one; and (9) any excuse for the parent's acts or omissions. *Id.*

Evidence that is probative of the predicate grounds for termination may also be probative of the best interest of the children. *In re C.H.*, 89 S.W.3d at 28. The absence of evidence in support of some of these factors would not be dispositive, "particularly if the

---

[5] Because we conclude the evidence is factually and legally sufficient to support termination under Subsections (D) and (E), we do not need to review the sufficiency of the evidence under Subsections (N) and (O). *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal."); *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022) (noting only one ground is necessary to uphold termination).

evidence were undisputed that the parental relationship endangered the safety of the child." *Id.* at 27. Further, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the children. *Id.*

**B.      Analysis**

By his second issue, Father argues that termination of his parental rights was not in the best interest of the children. We disagree.

Considering the first *Holley* factor, Banda's testimony revealed that Ivan and Jack expressed "desperately" that they did not want to "be returned" to Father.[6] Banda testified that Ivan expressed "he would definitely not want to be reunified with his parents." Jack stated that "he didn't want to go back home with Mommy or Daddy" and would remain in foster care. According to Banda, Ivan would "shake his head" and "cry hysterically" while asking her to "please not take him back" to Mother and Father. Bates testified that Ivan communicated that Father could not "provide a safe home" for him. Bates also stated that Ivan "does not want to live with his father" and became "uncomfortable with the phone visits." Bates testified that, a week before the trial commenced, Ivan approached a "social worker at the school" and expressed that he "need[ed] some help" due to having "anxiety . . . because [he] could possibly go home to [his] parents." Ivan was "scared about the results of trial" and did not believe he could protect his brother from Mother and Father. As to the second *Holley* factor, M.H.C. testified that Ivan had been "evaluated for depression." She also stated that Jack—at seven years old—"wears a diapers at night,"

---

[6] As noted above, Ivan and Jack were ten and seven years old, respectively, at the time of this testimony.

19

and has ADHD and "speech therapy problems." Accordingly, we conclude these factors weigh in favor of termination.

Considering the third and eighth *Holley* factors, the record reflects that the Department had ongoing concerns of domestic violence and drug use by Father. As detailed above, testimony revealed multiple domestic disputes with Father that necessitated the involvement of law enforcement. Testimony also revealed that Father violated court orders that prohibited him from going to Mother's home. The children articulated that they were scared to go home with Father. Banda and Rodriguez also testified that Mother and Father had a history of domestic violence. Mother admitted to a history of domestic violence with Father as well.

Father tested positive for methamphetamines and had not submitted to a drug test since July of 2023. Bates testified that "the drug use was apparent within the home and within the people that they were in contact with regularly" and that the children were "behind in their learning because of neglect." She further testified that "the parents have not maintained sobriety since the first intake in 2019." According to Bates, Father did not complete a hair follicle drug test despite agreeing to do so, and also was not admitted into drug court. Testimony revealed that Ivan had acknowledged that his parents could not "provide a safe home for him" and that he had "been reaching out since he was [five] years old for help." Ivan also expressed concerns that if he were to be returned to his parents, he would not be able to protect his younger brother. These factors support a finding in favor of termination.

Considering the fifth, sixth, and seventh *Holley* factors, testimony revealed that the children did not have consistent schooling until being placed in foster care and had

previously been placed with and removed from different families multiple times. Jack was placed with family friends before being removed due to the death of his sister Jane under their care. Ivan and Jack were placed with J.A. and D.C. at some point before being removed after issues with the home study at that placement. Additionally, Father was provided services through the Department, but did not demonstrate that he could provide a safe and stable environment for his children. Bates testified that Father had "been consistently in and out of jail so he cannot . . . provide a level of safety for the [children]." A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in determining best interest. *In re G.A.C.*, 499 S.W.3d 138, 141 (Tex. App.—Amarillo 2016, pet. denied); *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.). Accordingly, these factors support the trial court's best interest finding.

Considering the *Holley* factors, we conclude that the evidence was legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship was in the best interest of Ivan and Jack *See Holley*, 544 at 371–72. Father's second issue is overruled.

## V. Conclusion

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Delivered and filed on the
1st day of May, 2025.